1    **UNITED STATES DISTRICT COURT**

2    **EASTERN DISTRICT OF NORTH CAROLINA**

3                              )
     **UNITED STATES OF AMERICA,**    )
4                              )    **DOCKET NO. 5:22-MJ-01651-JG-1**
                    **Plaintiff,**    )
5                              )
     **vs.**                        )
6                              )
     **PARKER A. GIBSON,**          )
7                              )
                    **Defendant.**   )
8    _____

9        **TRANSCRIPT OF PRELIMINARY HEARING AND DETENTION HEARING**
            **BEFORE MAGISTRATE JUDGE ROBERT T. NUMBERS, II**
10               **MONDAY, AUGUST 1, 2022; 10:30 AM**
                    **RALEIGH, NORTH CAROLINA**
11

12   **FOR THE PLAINTIFF:**
            Office of the United States Attorney
13          By:  Bradford M. DeVoe, AUSA
            150 Fayetteville Street
14          Suite 2100
            Raleigh, NC 27601
15

16   **FOR THE DEFENDANT:**
            The Salmon Law Firm LLP
17          By:  Elisa Salmon, Esq.
            101 East Front Street
18          Lillington, NC 27546

19   Audio Operator:                CLERK'S OFFICE PERSONNEL

20
                         eScribers, LLC
21                    7227 N. 16th Street
                         Suite 207
22                    Phoenix, AZ 85020
                       973-406-2250
23                    www.escribers.net

24   Proceedings recorded by electronic sound recording; transcript
                 produced by transcription service.
25



1                          I N D E X

|                      |        |       |          |         | VOIR |
| WITNESSES:           | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
| For the Plaintiff:   |        |       |          |         |      |
| Justin Garcia        | 5      | 30    | 58       | 59      |      |
|                      |        |       |          |         |      |
| For the Defendant:   |        |       |          |         |      |
| Roger Gibson         | 62     | 74    |          |         |      |
| Michelle Melgar      | 75     | 81    |          |         |      |

| EXHIBITS | DESCRIPTION                        | ID. | EVID. |
| -------- | --------------------------------- | --- | ----- |
| For the Plaintiff: |                         |     |       |
| P-1      | DD Form 214                       |     | 7     |
| P-2      | Enlisted record brief             |     | 7     |
| P-3      | DA Form 4137                      |     | 14    |
| P-4      | Photo of drones                   |     | 17    |
| P-5      | Photo of grenades                 |     | 20    |
| P-6      | Emergency custody order           |     | 28    |
| For the Defendant: |                         |     |       |
| D-1      | Storage unit terms                |     | 35    |
| D-2      | Gibson family Florida itinerary   |     | 68    |
| D-3      | Text between defendant and Roger Gibson |     | 70    |
| D-4      | Family photos                     |     | 74    |
| D-7      | Letter from family law attorney   |     | 88    |

| RULINGS:                       | PAGE | LINE |
| ------------------------------ | ---- | ---- |
| Criminal complaint dismissed   | 108  | 10   |



Colloquy

1                     P R O C E E D I N G S

2              THE CLERK:  All rise.

3              The United States District Court for the Eastern

4       District of North Carolina is now in session, the Honorable

5       Judge Robert T. Numbers, II presiding.  Be seated and come to

6       order.

7              THE COURT:  Good morning, everyone.

8              MR. DEVOE:  Good morning, Your Honor.

9              MS. SALMON:  Good morning, Your Honor.

10             THE COURT:  We're here in the United States District

11      Court for the Eastern District of North Carolina sitting in

12      Raleigh for preliminary criminal proceedings.  We're going to

13      begin today -- or our sole matter today is United States of

14      America v. Parker Allen Gibson 5:22-MJ-1651.

15             Would counsel people identify themselves for the

16      record, beginning with counsel for the United States?

17             MR. DEVOE:  Brad DeVoe on behalf of the government,

18      Your Honor.

19             MS. SALMON:  Good morning, Your Honor.  Elisa Salmon

20      on behalf of Mr. Parker Gibson, the defendant.

21             THE COURT:  Good morning, Counsel.

22             So we're here today for the defendant's preliminary

23      and detention hearings.  I will conduct both those hearings at

24      the same time.  The United States bears the burden on the

25      issue of probable cause, so I'll ask the government to proceed



Colloquy

1    first today.

2            MR. DEVOE:  Yes, Your Honor.

3            MS. SALMON:  Your Honor, just as a preliminary

4    matter, I have several exhibits and documents that we intend

5    to make part of the proceeding.  And I understand that the

6    government also has several exhibits and documents.  We would

7    ask that Mr. Gibson be uncuffed, just at the hands, if that it

8    was all right with Your Honor, so he can assist me in looking

9    at some of these documents.  He's not had an opportunity to do

10   so because he's been in custody since his arrest.  So if he

11   could just be uncuffed at the hands?  I understand the

12   government does not object.

13           THE COURT:  Any objection?

14           MR. DEVOE:  No, Your Honor.

15           THE COURT:  What's the marshal's position?

16           UNIDENTIFIED SPEAKER:  Customarily, Your Honor, we do

17   not allow -- we always keep them in shrinks (ph.), full

18   shrinks during (indiscernible) because --

19           THE COURT:  Has he given you any problems since he's

20   been here?

21           UNIDENTIFIED SPEAKER:  I am not aware of any

22   problems --

23           THE COURT:  All right.

24           UNIDENTIFIED SPEAKER:  -- (indiscernible).

25           THE COURT:  Then we'll unshackle him for the



Justin Garcia - Direct

1    proceedings today.

2            MS. SALMON:  Thank you, Your Honor.

3            MR. DEVOE:  Your Honor, the government would call

4    Special Agent Justin Garcia.

5            THE CLERK:  Please raise your right hand and place

6    your left hand on the Bible.

7              PLAINTIFF'S WITNESS, JUSTIN GARCIA, SWORN

8            THE CLERK:  Thank you.  You can (indiscernible).

9                        DIRECT EXAMINATION

10   BY MR. DEVOE:

11   Q.   Agt. Garcia, what is your job?

12   A.   I'm a special agent with the United States Army Criminal

13   Investigation Division.

14   Q.   How long have you been doing that job?

15   A.   September would be approximately five years, sir.

16   Q.   What are your responsibilities in that job?

17   A.   My job is to conduct felony level investigations anywhere

18   there is an army interest or an army nexus.

19   Q.   Are you familiar with the investigation of Mr. Parker

20   Gibson?

21   A.   Yes, sir, I am.

22   Q.   How did it come to your attention?

23   A.   Sir, it came to our attention from a previous unit member

24   who reported that Ms. Gibson had identified what she believed

25   to be stolen military equipment in a storage unit that she had



Justin Garcia - Direct

1    in her name.  And she went ahead and -- and reported that to

2    us, so.

3    Q.   So you said, Ms. Gibson.  That's the defendant's wife?

4    A.   Yes, sir.

5    Q.   You said she reported that Mr. Gibson had stolen items in

6    the storage unit?

7    A.   Yes, sir.

8    Q.   Before we get into the specifics of the investigation,

9    I'd like to take a minute to talk about Mr. Gibson's

10   background and history.

11           MR. DEVOE:  With the Court's permission, I'd like to

12   show the witness Government Exhibit 1.

13           THE COURT:  You may.

14   BY MR. DEVOE:

15   Q.   What is that?

16   A.   This would be the DD214 of Mr. Parker Gibson, sir.

17   Q.   What is a DD Form 214?

18   A.   It is also known as a certificate of release or discharge

19   from active duty, which summarizes your military education

20   declaration, medals, badges, citations to include campaigns,

21   and anything additional information.

22   Q.   And is that a true and accurate presentation of Mr.

23   Parker Gibson's DD Form 214?

24   A.   Yes, sir, it is.

25           MR. DEVOE:  With the Court's permission, I'd like to



Justin Garcia - Direct

1    show the witness Government Exhibit 2.

2            THE COURT:  You may.

3    BY MR. DEVOE:

4    Q.    What is that?

5    A.    This is the enlisted record brief or ERB for Mr. Parker

6    Gibson.

7    Q.    And what is an enlisted record brief?

8    A.    The ERB is a document that essentially covers an

9    individual's entire military career, everything from home of

10   record, to duty locations, to their ASVAB testing scores,

11   military education awards and decorations, clearances that

12   they've received, as well as overseas and deployment

13   operations that they've been on.

14   Q.    So between Government Exhibit 1 and Government Exhibit 2,

15   that gives a pretty broad background in the defendant's

16   military history?

17   A.    Yes, sir, it does.

18           MR. DEVOE:  Your Honor, the government would request

19   to admit Government Exhibit 1 and Government Exhibit 2?

20           MS. SALMON:  No objection.

21           THE COURT:  So admitted.

22   BY MR. DEVOE:

23   Q.    Can you describe, summarily, Mr. Gibson's military

24   service?

25   A.    Yes, sir.  Mr. Gibson initially came into active service



Justin Garcia - Direct

1    in 2000, had a -- had a break in service from 2008 to 2011.

2    So in that initial term, he served as a combat engineer, did a

3    couple of deployments, and then had the break in service, and

4    came back in under the -- the job of intelligence in cyber.

5    From there, he was assigned to the unit here, where he

6    specialized in unmanned aerial systems.  He's received

7    numerous awards and decorations to include Sapper Tab, which

8    places an emphasis on explosives and demolitions.  He's also,

9    according to his DD214 a Ranger Tab, which is advanced

10   infantry tactics -- tactics and unit training.

11   Q.   And you said the Sapper Tab focuses on explosives.  That

12   would be training in both how to use explosives and anything

13   else?

14   A.   As -- as -- as well as to use them, implement them,

15   disarm them, and essentially to -- to make them out of minimal

16   equipment.

17   Q.   Did Mr. Gibson also have SERE training?

18   A.   Yes, sir, he did.

19   Q.   And what is SERE training?

20   A.   SERE is short for survive, escape, resist, and evade.

21   And that training consists of -- for military personnel, if

22   they were to ever become a POW or captured in a deployed

23   environment, training in there includes how to deal with

24   interrogation techniques from the enemy, how to handle

25   escaping being in different types of environments, and using



Justin Garcia - Direct

1    your environment to your advantage.

2    Q.   In addition to the training, did Mr. Gibson also earn two

3    Bronze Stars and a Purple Heart?

4    A.   Yes, sir, he did.

5    Q.   Prior to transitioning to retirement, what was Mr.

6    Gibson's last job?

7    A.   Mr. Gibson was serving as the chief intel sergeant for

8    the unit where he was in charge of UASes, unmanned aerial

9    systems, as well as drones, and different -- different

10   projects within that.

11   Q.   Do you know what brought about his transition to medical

12   retirement?

13   A.   Yes, sir.  Mr. Gibson was transferred with different

14   sections within the unit due to poor performance and -- and

15   not showing up to work, dereliction of duty, and subsequently

16   was transferred into the duties of working with the first

17   sergeant.  From there, there was an attempt to have him

18   removed from the unit due to poor performance.  It came back

19   that the military -- or excuse me, the medical section was

20   working a medical piece for him, so that -- that piece

21   started.

22   And then he ended up getting moved from the unit PCSing to the

23   Warrior Transition Battalion out of Fort Bragg -- or main post

24   Fort Bragg -- excuse me -- where he was ultimately medically

25   retired.  And then --



Justin Garcia - Direct

1   Q.   What is the Warrior Transition Battalion?

2   A.   The Warrior Transition Battalion is for servicemembers

3   that ultimately get medically retired out of the -- out of the

4   military due to, most likely, combat-related injuries.

5   Q.   What were the medical issues in Mr. Gibson's case?

6   A.   Yes, sir.  So there was signs of traumatic TBI or

7   extensive TBI.

8   Q.   And TBI is?

9   A.   Traumatic brain injury.

10   Q.   Okay.

11   A.   Insomnia, ADHD, low testosterone levels, and then other

12   physical injuries, herniated disc, shoulder injuries as well.

13   Q.   You may have mentioned it, but I think I missed it.  Was

14   there also post-traumatic stress disorder?

15   A.   Yes, there was.

16   Q.   And those were the ultimate causes of him being retired

17   from the military?

18   A.   Yes, sir.

19   Q.   Returning to the investigation, you had mentioned that

20   you had contact from Mr. Gibson's wife.  Approximately when

21   was this contact?

22   A.   It was the end of June of 2022.

23   Q.   What did she tell you at that point?

24   A.   She told me that she, on the request of Mr. Parker

25   Gibson, in March of 2020, to take out a storage unit because



Justin Garcia - Direct

 1  he was having a dispute with his business partners for Aerial

 2  Business Solutions, the -- Mr. Roy Gaskins (ph.).  There was

 3  something to the effects of that they wanted 10,000 dollars

 4  for tax purposes.  Mr. Gibson did not want to pay that, so he

 5  requested Ms. Kelsey Gibson to go ahead and take out the

 6  storage unit so he could transfer the property that he had in

 7  that, in the Aerial Business Solutions storage unit, to that

 8  one.

 9  Ms. -- Ms. Gibson says that she went ahead, took out the

10  storage unit, placed a lock on it, and gave Mr. Gibson the

11  key.  A few days later, she went ahead and she deployed for --

12  I think it was ninety days -- to Jordan.

13  Q.   And you mentioned a date as to when they had that

14  conversation.  What was that date?

15  A.   In March of 2021, excuse me.

16  Q.   2021?

17  A.   Yes.

18  Q.   Okay.  I believe the first time you said March of 2020,

19  but it was actually March of 2021; is --

20  A.   Yes.

21  Q.   -- that correct?

22  Okay.  And so in March of 2021, what was Mr. Gibson doing at

23  that point?  Was he still serving in the military?

24  A.   Yes.  He -- and then going through the medical board

25  process.



Justin Garcia - Direct

1  Q.   So he was going through the medical board process.  So he

2  was not actively deploying or anything along those lines,

3  correct?

4  A.   Correct.  Yes, sir.

5  Q.   Had he started an aerial photography business, as far as

6  you're aware, at that point?

7  A.   Yes, the Aerial -- Aerial Business Solutions.

8  Q.   Okay.  And that was the cause of the dispute with his

9  business partners?

10  A.   Yes, sir.

11  Q.   Okay.  So.  Did Mrs. Gibson actually rent the unit?

12  A.   Yes, she was on the contract.

13  Q.   And when did that contract start?

14  A.   In March of 2021 -- sorry, March of '21.

15  Q.   Okay.  So at the time of her contact unit, what did -- or

16  contact with you, what did she tell you about the storage unit

17  itself?

18  A.   Yes, sir.  So she said she went ahead and entered the

19  storage unit and her first action was that she saw two

20  military size wall lockers.  She opened the first one on the

21  right, where she identified what appeared to look like a -- a

22  military drone in the form of a helicopter -- one of the

23  smaller sizes.  As she continued her search, she found

24  magazines with green-tip ammunition -- standard army green-tip

25  ammunition, different Pelican cases with extensive amount of



Justin Garcia - Direct

1    ammunition of various calibers, as well as to UASes, unmanned

2    aerial systems, rather large in size, and different --

3    different drones, commercially -- could be commercially

4    purchased drones, and numerous unit swag [slash] -- or unit

5    memorabilia.

6    Q.   Was she able to immediately get into the storage locker,

7    from her description?

8    A.   No, sir, she was not.  She said that when she went and

9    checked the storage unit, Mr. Gibson had placed a new lock on

10   it.  So she returned to the -- the -- the management facility,

11   asked for bolt cutters, provided identification, saying that

12   she was the one on the contract, and then went ahead and cut

13   the lock, and entered her storage unit.

14   Q.   What is her background that she would be able to identify

15   this as stolen military equipment?

16   A.   Ms. -- Ms. Gibson is currently in -- serving as an active

17   duty warrant officer in the intelligence community, serving

18   with the Joint Special Operations Command, so the J- -- also

19   known as JSOC.  She has an extensive military history, as well

20   as deployment and supporting JSOC, as well as -- as the unit

21   as well.

22   Q.   Was she in the same unit as Mr. Gibson?

23   A.   She was not.

24   Q.   So they were in two different units, both assigned to

25   special operations?



Justin Garcia - Direct

1    A.    Yes.

2    Q.    Did you ultimately enter the storage unit?

3    A.    I did, sir, after receiving written and verbal consent

4    from Ms. Gibson.

5          MR. DEVOE:  With the Court's permission, I'm going to

6    show you what's been marked as Government Exhibit 3.

7          THE COURT:  You may.

8    BY MR. DEVOE:

9    Q.    What is that?

10   A.    This is a DA Form 4137, also known as an

11   evidence/property custody document or E/PCD for short.  This

12   is used during -- for army law enforcement in the -- in the

13   event that they are seizing any type of evidence.

14   Q.    Is that a form that you have in front of you specific to

15   the seizure of evidence from the storage locker provided by

16   Ms. Gibson?

17   A.    Yes, sir, it is.

18   Q.    Is that form a true and accurate representation of

19   everything that you seized from that locker?

20   A.    Yes, sir, it is.

21         MR. DEVOE:  Your Honor, with your permission, I'll

22   ask to offer Government Exhibit 3?

23         MS. SALMON:  No objection.

24         THE COURT:  So admitted.

25   BY MR. DEVOE:



Justin Garcia - Direct

1  Q.   Was everything in the unit seized?

2  A.   No, sir, it was not.

3  Q.   What did you seize?

4  A.   Everything that was believed to be government property,

5  sir.

6  Q.   And so what kind of things were not seized?

7  A.   There was a surfboard.  There was family blankets, some

8  tools.  Mr. Gibson had -- had tools in there.  There was other

9  family stuff, out -- outdoor stuff, camping equipment, and

10 other personal items.

11 Q.   Of the military equipment.  Was it what Ms. Gibson had

12 described to you?

13 A.   Yes, sir, it was.

14 Q.   So it included the drones, grenades, and all the other

15 items?

16 A.   Yes, sir.

17 Q.   Since the seizures, have those items been definitively

18 determined to belong to the military?

19 A.   Yes, sir.

20 Q.   How did that occur?

21 A.   That was coordinated through the -- the unit personnel

22 who are specialized in those specific sections.  So

23 specifically, the ammunition and the grenades were coordinated

24 through the ASP.  And then the drone --

25 Q.   ASP?  I'm sorry.



Justin Garcia - Direct

1    A.    I'm sorry.

2    Q.    ASP stands for --

3    A.    Yeah, ammo -- ammo supply point.

4    Q.    Okay.

5    A.    -- and then the -- as well as the drones and the -- the

6    UASes was done through the UMS section.

7    Q.    And were they linked through things like serial numbers

8    on the items themselves?

9    A.    Yes, sir, that is correct.

10   Q.    And those serial numbers could be tied back to numbers

11   that were used for the military?

12   A.    Yes, sir.

13   Q.    Now, the affidavit in support of the criminal complaint,

14   references to two Puma drones.  What are those?

15   A.    Those are rather large drones.  My understanding is that

16   they were the first -- first generation -- either gen one or

17   gen two -- rather large with the wings expanding about eight

18   feet, have the ability to conduct intelligence reconnaissance,

19   as well as carry out different payloads.  And then found

20   within them, contain different gimbal stabilizers, which are

21   used for the cameras as well as lasers.

22   Q.    What is the value of these Puma drones?

23   A.    I was told that a full Puma drone would be in the amount

24   of 250,000 dollars.

25        MR. DEVOE:  With the Court's permission, I'd like to



Justin Garcia - Direct

1    show him Government Exhibit 4.

2         THE COURT:  You may.

3    BY MR. DEVOE:

4    Q.    What is that?

5    A.    That would be one of the -- one of the drones that was

6    seized in the search of the storage unit, sir.

7    Q.    And that picture is a true and accurate representation of

8    the drones that were seized --

9    A.    Yes, sir.

10   Q.    -- or one of the drones that were seized?

11   A.    Yes, sir.

12        MR. DEVOE:  Your Honor, I'd offer Government Exhibit

13   4?

14        MS. SALMON:  No objection.

15        THE COURT:  So admitted.

16   BY MR. DEVOE:

17   Q.    Were there other items that were accessories to these

18   drones that were recovered as well?

19   A.    Yes, sir, there was.

20   Q.    What were those?

21   A.    Those would be different wings, wingtips, tailpieces, as

22   well as propellers, different -- or extra gimbal stabilizer

23   pieces -- units by themselves.  There was a launching system

24   that was also found in -- in another Pelican case.

25   Q.    I believe you had mentioned this, but were there other



Justin Garcia - Direct

1 UAVs and drones seized as well from that besides this, the two

2 Pumas?

3 A. Yes, sir, there was.

4 Q. Approximately how many?

5 A. Twenty -- approximately twenty.

6 Q. Okay. Were they all like the Puma or were they different

7 types of drones?

8 A. No, sir, they were not. There was the Pumas. There was

9 other DJI model drones, as well as other -- other smaller

10 military type drones.

11 Q. The affidavit in support of the criminal complaint also

12 references two incendiary grenades that were recovered. Were

13 those live grenades?

14 A. Yes, sir, they were.

15 Q. And were you able to discern which unit had

16 accountability for those grenades?

17 A. Yes, sir. That was coordination done through the ASP and

18 determined it belonged to the unit.

19 Q. And that's the same unit that Mr. Gibson was a member of?

20 A. Yes, sir.

21 Q. What can you tell us about their last accounting?

22 A. I believe they were last drawn -- I believe it was in

23 October of 2016, and last accounted for in August of 2020.

24 Q. And the accounted for, were they on base at Fort Bragg?

25 A. No, sir, they were not.



Justin Garcia - Direct

1  Q.   Where were they?

2  A.   They were determined to be in a forward operating

3  deployed environment.

4  Q.   And so how would that accounting occur?

5  A.   The grenades would have been in -- in hold with the ASP.

6  In the event that a team or unit or individual was going out

7  on a mission, that individual would have to go and draw them

8  from the ASP and then take them on mission.  Once they were

9  done with the mission, if the -- if the grenades were not

10  used, they would subsequently be turned into -- back into the

11  ASP.  If they are deployed or used during the operation, then

12  they would have to notify the TOC or --

13  Q.   And what is the TOC?

14  A.   Tactical operation center, essentially where the

15  leadership is notified of any type of munitions that are used.

16  And then that would go up through the reporting criteria and

17  go up to the necessary people that need to know, essentially.

18  Q.   And so according to the reporting that was available for

19  these grenades, they had been a part of this particular unit,

20  correct?

21  A.   Yes, sir.

22  Q.   But they had not been used or accounted for at this

23  point?

24  A.   Correct.

25  Q.   Were the grenades -- how were the grenades themselves



Justin Garcia - Direct

1  found?

2  A.   The grenades were located in a tin or metal footlocker

3  with different -- I mean, there was other -- as well as other

4  items to include a claymore detonating device and another

5  claymore piece.  There were two classified maps also located

6  in -- in that footlocker, as well as one red smoke grenade.

7        MR. DEVOE:  With the Court's permission, I'm going to

8  show you Government Exhibit 5.

9        THE COURT:  You may.

10 BY MR. DEVOE:

11 Q.   What is that?

12 A.   This is a photograph of that -- that tin footlocker with

13 the two incendiary grenades on top.

14 Q.   And is that a true and accurate representation of how

15 those grenades were found?

16 A.   Yes, sir.

17       MR. DEVOE:  With the Court's permission, I'd offer

18 Government Exhibit 5.

19       THE COURT:  Any objection?

20       MS. SALMON:  No, sir.

21       THE COURT:  So admitted.

22 BY MR. DEVOE:

23 Q.   I'd like to turn your attention back to Government

24 Exhibit 3, which I believe you still have up there with you,

25 and specifically, item number 61 on Exhibit 3.  What is that



Justin Garcia - Direct

1  described in item 61?

2  A.   Yes, sir.  It was identified as a case.  It had duct tape

3  reading, dog gear, containing three OCP military style

4  pouches, two OCP dog harnesses, two dog collars, blue and

5  black in color.

6  Q.   And did the guard dog gear have any relevance to Mr.

7  Gibson's military history?

8  A.   Not -- not within the unit.  But my understanding from

9  Ms. Gibson is that during his first initial service as serving

10  as a combat engineer, he did operate as a dog handler while

11  deployed.

12  Q.   Turning your attention to items number 25 through 31 on

13  that exhibit --

14  A.   Okay.

15  Q.   -- what do those items describe?

16  A.   Items 25 through 31 refer to all of the unit memorabilia

17  that was located during the search of the storage unit.

18  Q.   And this unit memorabilia, can you give us an idea of

19  what that is?

20  A.   The unit memorabilia is -- is -- essentially, we call it

21  the swag shop.  It's operated by the first sergeant and

22  contains different various items with the unit -- with the

23  unit logo placed on it.  And those range from YETI coffee cups

24  in different sizes, coins, handmade wooden flags, decanters,

25  as well as other various items.



Justin Garcia - Direct

1   Q.   And would you be able to buy those anywhere?

2   A.   No, sir, only as a -- as a unit member, through the first

3   sergeant.

4   Q.   And how are you supposed to keep those items?

5   A.   Close hold due to the -- the unit, obviously.

6   Q.   Can you briefly describe for the Court the ammunition

7   that was recovered in the storage locker?

8   A.   Yes, sir.  So the ammunition was in excess of -- of

9   3,000 -- 3,000 rounds of various calibers.  And some -- some

10   of them were unit specific or special operations specific due

11   to the lot number that were identified on them, which was

12   confirmed through the ASP.

13   Q.   So that the only place you could get those would be

14   through the military unit that Mr. Gibson was in?

15   A.   Correct, certain -- certain calibers.  Yes, sir.

16   Q.   Since Mr. Gibson's initial appearance, was another search

17   undertaken besides the one of the storage locker?

18   A.   Yes, sir.

19   Q.   Where was that taken?

20   A.   That was conducted at the residence of Mr. and Mrs.

21   Gibson.

22   Q.   Had it been planned for an earlier time?

23   A.   Yes, sir, it was.

24   Q.   Why did it not go then?

25   A.   Coordination was ongoing with the FBI out of



Justin Garcia - Direct

1    Fayetteville, and where they brought in the FBI SWAT team, and

2    due to Mr. Parker's training, his skills with us in UASes

3    or -- and UMSes, as well as the ammunition -- believed

4    ammunition in the residence.  It was a precautionary measure

5    and safety measure that they did not want to go ahead and

6    carry out their initial plan of doing a call-out of the

7    residence.  So they basically came down to Mr. Gibson's

8    capabilities in the event that it turned into that.

9    Q.    Was anything found in that search?

10   A.    Yes, sir.

11   Q.    What was found?

12   A.    There were other drones and drones that were found that

13   could also be commercially purchased, but unknown to be

14   military equipment at this time, as well as more ammunition

15   within a -- a Pelican case, as well as Dura-Blocs or -- or

16   the -- the rubber -- the rubber material used for ranges --

17   like, indoor ranges and stuff like that, and -- and an

18   excessive amount of that.

19   Q.    Did Mr. Gibson have permission to possess any of the

20   discussed military items beyond his retirement?

21   A.    No, sir.

22   Q.    Did he have any permissions to possess them, even off-

23   post, prior to his retirement?

24   A.    No, sir.

25   Q.    Could the drones or the UAVs, the UASes, or grenades in



Justin Garcia - Direct

1   particular, have been properly gifted or given to him in any

2   way?

3   A.   No, sir.

4   Q.   In regard to the grenades, was ATF consulted about their

5   registration?

6   A.   Yes, sir, they were.

7   Q.   And what was learned from that --

8   A.   That --

9   Q.   -- consultation.

10  A.   That they -- that the grenades could not be registered

11  or -- or legally owned.

12  Q.   So in no way could those grenades be owned in any way?

13  A.   Correct.

14  Q.   So no registration even exists for grenades?

15  A.   Correct.

16  Q.   Okay.  Now, you mentioned Mr. Gibson's wife reported the

17  contents of the storage unit.  Did she immediately report her

18  findings after she had first gone into the storage unit?

19  A.   No, sir, she did not.  Ms. Gibson, in her statement, said

20  that she went ahead and she identified the -- the items in the

21  storage unit after things in their marriage were starting to

22  get bad.  Once she identified the stuff, it was my

23  understanding that she spoke and discussed these things with

24  her therapist, and under her therapist's advice, was to go

25  back and begin to document and take photographs of the



1     property that was found within the storage unit, which --

2     which she did as -- and she also said that she was dealing

3     with trying to process it and essentially kind of take it all

4     in, and -- and -- and internalize it, and -- and -- and deal

5     with it.

6     And then after a few weeks, she went ahead and reached out to

7     a colleague who was a former unit member who would then, in

8     turn, reach out and contact us.  And we were contacted due to

9     Mr. Gibson's history with the unit, as well as the potential

10    items that were -- that she -- that she saw.  And she went

11    ahead and notified us specifically and not the Fort Bragg CID

12    office.

13    Q.   So let's talk about the time line a little bit.  So you

14    said earlier that she first rented this storage locker in

15    March of 2021, correct?

16    A.   Yes, sir.

17    Q.   And then after she rented the locker, she immediately

18    deployed?

19    A.   Yes, sir, she did.  She deployed for -- it was 90 to 120

20    days to Jordan.

21    Q.   Before she deployed, had she given Mr. Gibson access to

22    the locker?

23    A.   Yes, sir.

24    Q.   How did she do that?

25    A.   My understanding is that she gave him the keys, as well



Justin Garcia - Direct

1  as the -- the code to get into the -- through the gate, and

2  that was -- that was it.  And then she went ahead and

3  deployed.  And Mr. Gibson stated that she never returned to

4  the locker up until May of 2022.

5  Q.   So she never again went into that (indiscernible) between

6  March of 2021 until May of 2022; is that correct?

7  A.   According to her statement, yes, sir.

8  Q.   And remind us what caused her to go to the storage locker

9  at that point?

10  A.   Yes, sir.  She said that she attended her ILE training or

11  individual leader -- leader training out of Fort Huachuca,

12  Arizona.  She said that the relation -- her relationship with

13  Mr. Gibson started to kind of go down.  He began to

14  disassociate himself, stopped saying, I love you.  They were

15  really not talking or anything like that.

16  So she became concerned.  And then that's what kind of

17  prompted her to start searching for what she believed answers

18  as -- or a cause into Mr. Gibson's behavior, which ultimately

19  led her to the storage unit.

20  Q.   As far as Mr. Gibson's potential release, have you talked

21  with Mrs. Gibson about that potential release?

22  A.   Yes, sir, I have.

23  Q.   What is her position on that?

24  A.   Ms. -- Ms. Gibson would like Mr. Parker to be detained.

25  She's -- she's scared for her life, as well as what his --



Justin Garcia - Direct

1    what he would be doing.  He's made comments in the past to

2    her:  he's the wrong person that you want to back into the

3    corner; he wouldn't go out without a fight.  There was an

4    incident where he handed her a -- a bullet and said that he

5    would take his own life if he ever left her, as well as a --

6    another incident in the past where there was some -- that

7    turned physical in nature against her.

8            MR. DEVOE:  With the Court's permission, I'm going to

9    show you Government Exhibit 6.

10           THE COURT:  You may.

11   BY MR. DEVOE:

12   Q.   What is that?

13   A.   This is the order granting ex parte emergency --

14   emergency custody between Mr. and Mrs. Gibson.

15   Q.   And what is the date of that?

16   A.   This is stamped for 28 July of 2022.

17   Q.   Is that the same day of Mr. Gibson's arrest?

18   A.   Yes, sir, it is.

19   Q.   And why did she -- did she tell you why she sought that?

20   A.   Yes.  As -- due to the fact that she was scared of what

21   Mr. Gibson would do once he was notified of this

22   investigation.

23   Q.   And why was she concerned about what he would do once he

24   was notified?

25   A.   Just due -- again, due to the comments made in the past.



Justin Garcia - Direct

1   There was instances that Ms. Gibson was saying that Mr. Gibson

2   would frequently rotate the locations of his weapons within

3   the house.  That way, no one could really know where they were

4   at.  So she was concerned for that as well.

5           MR. DEVOE:  Your Honor, we'd offer Government Exhibit

6   6.  We'd request that it would be sealed due to the personal

7   nature of the information in it.

8           THE COURT:  Any objection?

9           MS. SALMON:  Your Honor, I don't object to it being

10  admitted.  However, I do object to it being sealed.  You can

11  go down to the Harnett County Courthouse and get this right

12  now.  It's not a sealed document for state court purposes.  So

13  I don't know of any reason for it to be sealed.  It is a

14  public document.  It was issued ex parte under the state court

15  statute that provides for such.  But this is a public

16  document; there's no reason to seal it.  We do object to that.

17          MR. DEVOE:  My understanding was that it was ex

18  parte.  I was not aware that it was available on the public

19  docket for the state court.

20          THE COURT:  All right.  I'll admit the document.  It

21  will not be under seal.

22  BY MR. DEVOE:

23  Q.  Special Agent Garcia, were you present at the initial

24  appearance last week?

25  A.  Yes, sir, I was.



Justin Garcia - Direct

1   Q.   And did you hear the presiding magistrate judge at that

2   time ask Mr. Gibson about his mental health history,

3   treatment, or medications?

4   A.   Yes, I did.

5   Q.   And did you hear his response?

6   A.   Yes, I did.

7   Q.   What was that?

8   A.   He said that he had not been treated for any mental

9   health -- mental health issues.

10  Q.   And from your review of the records, was that response

11  accurate?

12  A.   That was not.

13  Q.   And why?

14  A.   Mr. Gibson, again, was -- was treated for various things

15  such as PTSD, TBI, ADHD, low testosterone, severe depression,

16  and was also treated at NICoE, which the -- the acronym is

17  slipping my mind, but it's a -- you get a head -- head-to-toe

18  evaluation, again, for soldiers that have sustained injuries

19  due to combat.

20  Q.   And did you, in fact, obtain a number of medications for

21  Mr. Gibson after that initial appearance?

22  A.   Yes, sir, I did.

23        MR. DEVOE:  No further questions, Your Honor.

24        THE COURT:  Cross-examination?

25        MS. SALMON:  Thank you, Your Honor.



Justin Garcia - Cross

1                    CROSS-EXAMINATION

2  BY MS. SALMON:

3  Q.   Agent Garcia, were you part of the search of the storage

4  unit on June 22nd, 2022?

5  A.   Yes, ma'am, I was.

6  Q.   So who else was present during the search of the storage

7  unit on June 22nd, 2022?

8  A.   That would be the Special Agent in charge, Chief Elmer

9  Mason, and then Ms. Kelsey Gibson was there.

10  Q.   So just the three of you?

11  A.   Yes, ma'am.  Oh, I'm sorry.  And then, as well as the

12  Harnett County sheriff was there as well.

13  Q.   The Harnett County sheriff's deputy?

14  A.   Yes, ma'am.

15  Q.   All right.  So did you meet out at the storage unit there

16  in Cameron?

17  A.   Yes, ma'am, we did.

18  Q.   And did Ms. Gibson arrive in her own car?

19  A.   Yes, ma'am, she did.

20  Q.   So how did you get through the access gate to go into the

21  storage unit?

22  A.   Ms. Gibson gave us the access code for us to go ahead and

23  enter.

24  Q.   And did she accompany you or --

25  A.   Yes, ma'am, she did.



1    Q.    In a separate car?

2    A.    Yes, ma'am, she did.

3    Q.    All right.  And when you arrived, it was unit 204,

4    correct?

5    A.    Yes, ma'am.

6    Q.    And that was unit 204 at the USA Storage Center?

7    A.    Yes, ma'am, located at 67 Brandywood Court, Cameron,

8    North Carolina.

9    Q.    And when you got out to the unit 204, it was locked,

10   correct?

11   A.    Yes, ma'am, it was.

12   Q.    Did it have an operable lock on the unit?

13   A.    Yes, it did.

14   Q.    And Ms. Gibson unlocked that lock, correct?

15   A.    Yes, she did.

16   Q.    And did she used a key or a combination?

17   A.    I believe it was a key, ma'am.

18   Q.    And did you have an opportunity to speak to any of the

19   personnel at the USA Storage Center as part of your

20   investigation?

21   A.    I -- I spoke with them after, when I did a recon with the

22   FBI.  Then I spoke with the -- the manager that was there at

23   the time.

24   Q.    So did you do a recon prior to the search or after the

25   search?



Justin Garcia - Cross

1   A.   This recon was conducted after the search.  And it was in

2   relation to working in operation, or op, with the FBI for the

3   apprehension of Mr. Gibson.

4   Q.   So during that recon, you did not observe Mr. Gibson at

5   the storage center, did you?

6   A.   No, ma'am, I did not.

7   Q.   Were you part of his arrest?

8   A.   I was not.

9   Q.   Were you aware of the moment that he was arrested?

10  A.   I was.

11  Q.   You previously testified, right before Mr. DeVoe finished

12  asking you questions, that this custody order that was filed

13  on July 28th was done on the same day as his arrest.  Do you

14  recall saying that?

15  A.   Yes, ma'am.

16  Q.   But that's not right, is it?  He was arrested on Friday,

17  July 22nd, correct?

18  A.   It was a -- it was a Friday.  Yes, ma'am.

19  Q.   Okay.  And so if the Court records show that he was, in

20  fact, arrested on July 22nd, then that would be -- you'd have

21  a reason to disagree with that.  If you want to review that --

22  A.   No, ma'am.  This -- correct.

23  Q.   So he was arrested on July 22nd, 2022?

24  A.   That -- the Friday.  Yes, ma'am.

25  Q.   Okay.  And so then the custody order that was put into



Justin Garcia - Cross

1   evidence was taken out some seven or eight days later?

2   A.   Yes, ma'am.

3   Q.   Okay.  All right.  So when you went out to speak to the

4   personnel at USA Storage, did you request a print of the lease

5   agreement?

6   A.   I did not, no.  The -- the -- the lease agreement was

7   given to me by Ms. Gibson when we went out there and did the

8   initial search.

9   Q.   So you have, in fact, reviewed a copy of the lease

10  agreement, correct?

11  A.   Yes, ma'am.

12       MS. SALMON:  May I approach, Your Honor?

13       MS. SALMON:  You may.

14  Q.   Agent Garcia, I'm going to hand you what I have marked as

15  Defendant's Exhibit 1.

16       MS. SALMON:  And Your Honor, for your purposes, I

17  believe it's behind tab 1.  I believe it is behind tab 1.

18  Sometimes I get my numbering different than my notebooks.  I

19  apologize.

20  BY MS. SALMON:

21  Q.   So Agent Garcia, this is a copy of the subpoena that I

22  issued in this case.  I'm not asking you to identify that.

23  A.   Okay.

24  Q.   (Indiscernible) document.  But this document that I'm

25  handing you, USA Storage Center, is that a copy of the lease



Justin Garcia - Cross

1    agreement that you've reviewed?

2    A.    This right here is what I received from Ms. Gibson,

3    not -- this -- I didn't get the information sheet or a copy of

4    driver's license.  That piece right there that you have that's

5    two pages.  That is what I received from Ms. Gibson.

6    Q.    So you did not receive the document that I'm handing --

7    in my hands, with Ms. Kelsey Gibson's at the top?

8    A.    No, ma'am.

9    Q.    She did not provide that to you?

10   A.    No, ma'am, she did not.

11   Q.    Okay.  But she did, in fact, provide this USA Storage

12   Center Stockade terms dated 12th of May '21?

13   A.    Yeah.  Yes, ma'am.

14   Q.    Okay.

15   A.    I'm not recognizing the date.  She has said March of

16   2021.  This looks -- yes, what she handed me.

17   Q.    Okay.

18   A.    That was -- I mean, that could be March or May.  It's

19   poor -- poor writing on her part.  But yes, this -- this is

20   what I received from her.

21   Q.    Thank you.

22         MS. SALMON:  And Your Honor, I have provided a copy

23   of this.  I have the returned subpoena.  I have the storage

24   unit personnel under subpoena to both appear and produce.

25   They've produced; they are not here to appear.  Because I



Justin Garcia - Cross

1    received this pursuant to a subpoena that was validly issued

2    by the clerk of court, and because I am putting them in for

3    purposes of preliminary hearing, I'd ask that this be received

4    as Defendant's Exhibit 1 in its entirety, which are the

5    documents that I received pursuant to the validly issued

6    subpoena.

7         MS. SALMON:  May I approach with the subpoena?

8         THE COURT:  You may.

9         Any objection?

10        MR. DEVOE:  No, Your Honor.

11        THE COURT:  All right.  So admitted.

12   BY MS. SALMON:

13   Q.   Did Mrs. Gibson tell you that she did not list Mr. Gibson

14   as an authorized user on the storage unit when she rented it?

15   A.   She told me that she would get -- granted him access.  I

16   don't know if that would be technically an authorized user --

17   user -- excuse me.  But from what Ms. Gibson -- Mrs. Gibson

18   told me was that she gave Mr. Gibson access and gave him

19   the -- the gate code so he can have access.  So that -- that

20   was what was relayed to me.

21   Q.   So neither you nor anyone else in the investigation

22   actually asked for these documents from USA Storage to confirm

23   that this storage unit was, in fact, in Kelsey Gibson's name,

24   correct?

25   A.   Well, I asked -- I asked her to provide me with the



Justin Garcia - Cross

1    contract, which you just showed me right now.  So that's -- I

2    did ask for that.  And that was prior to getting the consent

3    from her.

4    Q.    But she did not give you the document that showed she was

5    the only person listed as an authorized user on the USA

6    Storage new customer information sheet, correct?

7    A.    Correct.

8    Q.    And in the criminal complaint, you were not -- were you

9    part of creating the criminal complaint that Agent Stern (ph.)

10   filed?

11   A.    I assisted in providing the documents, but Agent Stern

12   was the one that drafted and submitted that.

13   Q.    Did you have an opportunity to review that in

14   anticipation of your testimony today?

15   A.    Yes, ma'am.

16   Q.    So in this, Agent Stern tells the Court that Mrs. Gibson

17   has exclusive control of -- I'm sorry, that Mr. Parker Gibson

18   has exclusive control of unit 204; is that correct?

19   A.    Yes, ma'am.

20   Q.    That Mr. Gibson had the only keys to unit 204.  Is that

21   what she tells them?

22   A.    Yes, ma'am.  And that was Ms. -- again, Ms. Gibson said

23   that when she took out the -- the initial unit, placed a lock

24   on it, and handed the keys over to Mr. Gibson.

25   Q.    And so it was her representation to you all -- to you and



Justin Garcia - Cross

1   the other agents -- that Mr. Gibson did not want Mrs. Gibson

2   in the storage unit, correct?

3   A.   Correct.

4   Q.   That was not a place that she believed she was allowed to

5   go, correct?

6   A.   Correct.

7   Q.   She did not believe that she had any custody or control

8   over the items within it, correct?

9   A.   Correct.

10   Q.   It was made very clear to her by Mr. Gibson, according to

11   her, that she was not to enter that storage unit, correct?

12   A.   I wouldn't say that that was very clear.  But it was the

13   understanding that Mr. Gibson was going to be using that to

14   store his belongings in there from the Aerial Business

15   Solutions.

16   Q.   And not hers, correct?

17   A.   Correct.

18   Q.   And that's very important to this criminal complaint,

19   isn't it?

20   A.   Yes, ma'am.

21   Q.   The aspect of exclusive control of Mr. Gibson, right?

22   A.   Yes, ma'am.

23   Q.   Because there is no evidence of him ever physically

24   possessing these items at this stage in your investigation, is

25   there?



Justin Garcia - Cross

1   A.    Physically possessing the items, no, ma'am.

2   Q.    So there will be no video of him taking these items into

3   that storage unit, correct?

4   A.    No, ma'am.

5   Q.    Why not?

6   A.    My understanding is that there's no CCTV recording

7   capability at the storage unit.

8   Q.    So where did you get that information?  Who told you

9   that?

10  A.    From -- I believe it was from the -- the -- the

11  management office, the -- the guy that was there when we did

12  the initial op recon.  And -- and I can't recall there may

13  have been a camera in the front, at the gate entrance.  But my

14  understanding is that she would -- they do routinely hourly

15  checks while they're in the office for security measures to

16  make sure that no locks are -- are tampered with or -- or

17  broken into.

18  Q.    So USA Storage will have no information?  They will not

19  have any video of who actually put this stuff in unit 204,

20  correct?

21  A.    To my understanding right now, yes, ma'am.  That is

22  correct.

23  Q.    And at this stage in your investigation, Agent, the

24  military has confirmed that at some point some of these items

25  have been military property by serial number, correct?



Justin Garcia - Cross

1   A.   Yes, ma'am, that is correct.

2   Q.   But there is not a witness that will say that Parker

3   Gibson took a single one of these items off of the compound,

4   at this time?

5   A.   That would have to be up with the witnesses, ma'am.  But

6   I -- you know, again, Mr. Gibson was assigned to that specific

7   section where he had access to the items that were found and

8   retrieved in the storage unit.

9   Q.   Is there a witness that says Parker Gibson -- I saw

10  Parker Gibson take a single one of these items on the evidence

11  log?

12  A.   No, ma'am, not at this moment.

13  Q.   Now, Kelsey Gibson told you that she was going through a

14  divorce, correct?

15  A.   She never flat out said that she was going through a

16  divorce.  She said that their relationship was deteriorating.

17  And then I think this investigation would have triggered the

18  next step in a divorce.

19  Q.   So did Mrs. Gibson inform you, as part of this

20  discussions about the deterioration of marriage, that Mr.

21  Gibson had retained a family law attorney?

22  A.   No, that was never relayed to me.

23  Q.   Did she tell you that Mr. Gibson had expressed to her he

24  wanted to amicably separate and coparent their daughter,

25  Hayley (ph.)?



Justin Garcia - Cross

1  A.  No, ma'am.  That was never expressed to me.

2  Q.  Did Mrs. Gibson tell you that while she remains an active

3  duty chief warrant officer, Mr. Gibson is currently providing

4  100 percent of the out-of-school care for her -- not as we sit

5  here today, but prior to his arrest -- for Hayley and her son

6  from a prior relationship?

7  A.  I'm sorry.  For the prior -- say that again?

8  Q.  Mrs. Gibson has two children, right?

9  A.  Yes, ma'am.

10  Q.  And one is a son from a prior marriage?

11  A.  Correct.

12  Q.  And one is her daughter, Hayley, with Mr. Gibson,

13  correct?

14  A.  Correct, yes.

15  Q.  And did she tell you that Mr. Gibson takes care of the

16  kids while she works?

17  A.  Yes.  My understanding is -- it was relayed to me that

18  they both work together in order to get Hayley to her

19  gymnastics and they -- they kind of work that scheduling.  My

20  understanding, when it comes to finances, their finances are

21  separated with a joint -- mutual joint account to handle any

22  joint expenses, which include the mortgage, as well as

23  Hayley's gymnastics, and stuff like that, so.

24  Q.  So again, just so I'm clear, there are no videos right

25  now, correct?



Justin Garcia - Cross

1    A.    Correct.

2    Q.    No witnesses saying he possessed this right now, correct?

3    A.    Correct.

4    Q.    We are just going to take Mrs. Gibson's word for it that

5    he put it in there, right?

6    A.    That we have right now, yes, ma'am.

7    Q.    Mrs. Gibson reported this in the end of June of 2022.

8    How close to your search -- what was the time frame?  What was

9    the day that this was reported to CID?

10   A.    I believe it was the 20- -- was it the 20th, I believe?

11   It was -- it was the end of June.  My understanding, again,

12   for the -- the delay in the reporting was that she went ahead

13   and she reached out to a -- a colleague who was a former unit

14   member, who in turn reached out to a current unit member,

15   which ultimately made contact with us.  And she acknowledged

16   that there was -- there was a delay from her finding the

17   items, speaking with her therapist, and trying to, I guess,

18   deal with it herself, and then making contact -- ultimately us

19   making contact with her, so.

20   Q.    According to the criminal complaint that was filed in

21   this case on July 8th, 2022, she reported that she found these

22   items in 204 in early May of 2022; is that correct?

23   A.    Yes, that is correct.  In early -- yes.

24   Q.    So if --

25   A.    Sometime in May.



Justin Garcia - Cross

1 Q. So as many as forty-five days could have passed before

2 this was reported to CID, correct?

3 A. That is correct. But again, the delay being her reaching

4 out -- yes, you're absolutely correct. She could have -- she

5 could have identified this stuff and -- and walked right over

6 to main post Fort Bragg CID. But given her knowledge of Mr.

7 Gibson's association with the unit and the potential of the

8 equipment that could be identified in there as being unit

9 specific, she wanted to go ahead and get in contact with us --

10 that -- that works with the unit. And again, that -- there

11 was the delay of her reaching out to the individual and making

12 contact with the --

13 Q. So it just sat in her storage unit in her name for forty-

14 five days, correct?

15 A. Yes.

16 Q. And we don't have any information to confirm that, do

17 we -- just her word?

18 A. Correct.

19 Q. And during this time, during this forty-five-day period,

20 she's still leaving for work on the JSOC compound, right?

21 A. Yeah. Yes, ma'am, to my understanding.

22 Q. And she's leaving Mr. Gibson at home, caring for her son

23 from a previous relationship and their daughter together,

24 correct?

25 A. Yes, ma'am.



Justin Garcia - Cross

1    Q.    Both of whom are under twelve?

2    A.    The -- I believe the daughter -- I believe the son is --

3    is fifteen.

4    Q.    But both are minors?

5    A.    Yeah.  Yes, yes.

6    Q.    And her explanation for the delay, we're just taking her

7    word for it, right?

8    A.    Yes, ma'am.

9    Q.    All right.  Now you're, familiar as being a special agent

10   with Criminal Investigations Division of the United States

11   Army of The Universal Code of Military Justice, right?

12   A.    Yes, ma'am.

13   Q.    She had a duty, as a chief warrant officer, to

14   immediately report stolen government property, didn't she?

15   A.    She does.

16   Q.    And she did not do that, did she?

17   A.    She went ahead and reported it.  But again -- yes, she

18   does have an obligation to report it.  As far as, like, a --

19   time line requirements and -- and something like that, it's --

20   I mean, I would have to -- have to look into it.  I -- I know

21   as long as it's reported -- and we're not talking anything

22   like sexual assaults, where there's an immediate time -- time

23   requirements and stuff like that that's mandated by Congress.

24   Q.    Because she told you guys -- she told you and the other

25   agents that she cut the lock off of that unit in early May,



Justin Garcia - Cross

1 right?

2 A. Yes.

3 Q. So then she put a lock back on it, right?

4 A. She -- she did.

5 Q. Which is the lock that she then opened for you on June

6 22nd, correct?

7 A. Yes.

8 Q. Now, Agent Garcia, did you get the access and entry gate

9 information to show who was entering USA Storage and with what

10 frequency, prior to the search on June 22nd, 2022?

11 A. No, ma'am, I have not, not yet.

12 Q. So if Defense Exhibit 1 shows that this unit was accessed

13 May 4th, 2022, at 12:22:46 p.m., you have no idea who that

14 was, do you?

15 A. No, ma'am.

16 Q. And on 5/24/2022, you have no idea who that was, do you?

17 A. No, ma'am.

18 Q. And on 5/26/2022, at 5:42 p.m., you don't know who

19 accessed it at that time?

20 A. No, ma'am.

21 Q. On June 7th, 2022, at 7:01 p.m., you don't know who

22 access to then, do you?

23 A. No, ma'am.

24 Q. June 15th, 2022 -- and I'm going to highlight this one,

25 June 15th, 2022, at 8:45 a.m., unit 204 was accessed. You



Justin Garcia - Cross

1   have no idea who did that, do you?

2   A.   What was that date again, ma'am?

3   Q.   June 15, 2022.

4   A.   No, ma'am.

5   Q.   June 20th, 2022, at 2:03 p.m.?

6   A.   No, ma'am.

7   Q.   June 22nd, 2022, at 12:23 p.m., is that when you went out

8   to do your search, Agent Garcia?

9   A.   Yes, ma'am.  That would have been us.

10  Q.   Okay.  So from June 22nd, 2022 to July 20th, 2022, those,

11  we have some sense of who is entering?

12  A.   Yes, ma'am.

13  Q.   That was you and other agents with respect to this

14  investigation?

15  A.   Yes, ma'am.  That is correct.

16  Q.   I want to go back and talk a little bit about the DD214.

17  A.   Yes, ma'am, absolutely.

18  Q.   I believe that this was introduced as Government's

19  Exhibit 2 -- I'm sorry, Government's Exhibit 1.  What was

20  Parker Gibson's last operational unit, Agent Garcia?

21  A.   Last operational unit would have been with us, with the

22  3rd Operational Support Group.

23  Q.   And what is that commonly -- that's that commonly called?

24  A.   3rd Operational Support Group, ma'am.

25  Q.   Is it also known as Delta Force?



Justin Garcia - Cross

1    A.    I cannot answer that in open court, ma'am.

2              MS. SALMON:  Your Honor, may I approach?

3              THE COURT:  You may.

4         (Begin sidebar discussion)

5              MS. SALMON:  Your Honor, there's a lot of talk about

6    what my client is or is not capable of with respect to his

7    prior operational unit and specialized training he's received

8    as part of that.  I think if we're going to have a full and

9    frank discussion about how a bunch of stuff walked off the

10   JSOC compound at Fort Bragg, we need to just be completely

11   open in this courtroom about what they're saying his

12   operational capacities are and where they came from.

13   Otherwise, I think the vagaries are just going to leave us

14   with an unclear record.  And also it's something that's very

15   hard for my client to defend against.

16             THE COURT:  Well, I mean, the question currently was

17   about whether he's in Delta Force or not.  I mean, what do

18   you -- are you planning to get into a whole bunch of

19   additional details that are perhaps national security related?

20             MS. SALMON:  No, sir.  But I do think that it's

21   relevant to the fact that these are Delta Force items, because

22   I think that the implication that's being drawn between the

23   constructive possession in the unit 204 is that there is Delta

24   Force with glasses and Delta Force flags and things.  And if

25   we're not going to talk about why -- it would be -- it's a



1    very unusual unit, I would just proffer.  And I'm sure he

2    would admit that you can't take your whiskey glass home.  It

3    has to be held close because of the nature of the unit.

4         I also think it's highly relevant, Your Honor,

5    because it actually shows that he's not operational in Delta

6    after August of 2019 and has no munitions access after August

7    of 2019, once he's transported to headquarters for transition.

8    So I'm fine with just having --

9         MR. DEVOE:  You can ask those questions without

10   getting into any of that stuff that you were reading

11   (indiscernible).

12        MS. SALMON:  Yeah.  And I don't think that I'm

13   necessarily going there.  I just want it to sort of be

14   acknowledged that if we're going to talk about these special

15   operators' special abilities and imply that that somehow makes

16   them dangerous, we need to talk about it, and find a way to

17   stipulate for his honor who we're actually talking about.

18        MR. DEVOE:  Well, you can talk about training and

19   things without talking about specific units or

20   (indiscernible).  I don't see how that's relevant to any of

21   his training.

22        THE COURT:  I mean, so what are you asking from me,

23   as we stand here right now?

24        MS. SALMON:  I'm just saying that if we can all just

25   put in the record that his last operational unit was Delta



1    Force if we can stipulate to that.

2         MR. DEVOE:  (Indiscernible) think we can.

3         MS. SALMON:  This is very unusual.  I'm not sure how

4    (indiscernible).

5         MR. DEVOE:  I think it isn't unusual at all.

6         THE COURT:  I mean, it sounds like the witness is

7    fine with the more technical description of the unit and not

8    saying it's Delta Force.  I mean, let's proceed that way and

9    we can take it up as need be if we need to clear the courtroom

10   or do something else.

11        MS. SALMON:  Okay.

12        THE COURT:  But obviously, like, keep as much public

13   as possible, but --

14        MS. SALMON:  I understand.

15        THE COURT:  Yeah.

16        MS. SALMON:  Well, and I think I'll just refer to it

17   then, for purposes of ease is just special operations or

18   special forces.

19        MR. DEVOE:  I think special operations is fine.

20        MS. SALMON:  That's acceptable?

21        MR. DEVOE:  I think special forces group is fine.

22        MS. SALMON:  Yeah.  I just didn't anticipate that

23   being an issue.  So that's why -- I would not have asked the

24   question on the record, if I thought that it was.  I asked him

25   and he said that he had no concern.  Okay.  Thank you.



1          THE COURT:  Thank you.

2          (End sidebar discussion)

3    BY MS. SALMON:

4    Q.   Thank you, Agent Garcia.  With respect to Parker Gibson's

5    last operational or combat related unit assignment, he was

6    moved from his operational unit to a medical unit?

7    A.   Yes, ma'am.  That is correct.

8    Q.   In August of 2019, correct?

9    A.   The dates are -- are slipping my mind, but I would -- I

10   think we have his transition paperwork.  But again, that --

11   that date is slipping my mind.  I apologize.

12   Q.   Well, I believe you testified -- correct me if I'm

13   wrong -- or it may be September of 2019.  Does that sound

14   correct?

15   A.   I don't want to definitively say yes, ma'am.  I

16   apologize.

17   Q.   I believe you testified that he went over to an SRU.  And

18   I believe you may have mentioned that it was in 2019 on

19   direct.  And take your time.

20   A.   Yeah.  I don't have that -- that date on -- one me,

21   ma'am, at the moment.  I apologize.

22   Q.   So you do not know when his accesses were shut down?

23   A.   No, not off the top of my head.  No, ma'am.

24   Q.   And you do not know when his badges were restricted, when

25   he was transferred away from the unit?



Justin Garcia - Cross

1 A. No, ma'am.  But I could get those.

2 Q. And if the evidence shows that it was in September 2019

3 or in early 2020, you'd have no reason to disagree with that,

4 correct?

5 A. That -- that would be a correct statement, yes.

6 Q. Okay.  Because when he went to the headquarters unit at

7 Main Fort Bragg, he was no longer on the Joint Special

8 Operations Command compound, correct?

9 A. Yes, ma'am.  That is correct.

10 Q. And so once he's over in the Healing Transitions Unit

11 (ph.), he is no longer even going on the JSOC compound --

12 A. That --

13 Q. -- correct?

14 A. That is correct.  Yes, ma'am.

15 Q. He no longer has access to the JSOC compound, correct?

16 A. Correct.  Yes, ma'am.

17 Q. You testified on direct that the grenades specifically

18 were last accounted for in --

19 A. August of 2020, I believe is what it was.

20 Q. August of 2020 --

21 A. Yes, ma'am.

22 Q. -- on a forward operating deployed environment, correct.

23 A. No, ma'am.  That -- they were in a forward operating

24 deployed environment.  But again, as far as their last

25 accountability, as it was relayed to us from the -- the ASP



Justin Garcia - Cross

1    specialist, according to their records, was that -- it was

2    that date there.

3    Q.   So their record -- when they're out on deployment, that's

4    called, like, the theater property book, right?

5    A.   I -- I wouldn't know, ma'am.

6    Q.   Okay.  So but the ASP who told you these serial numbers

7    match, right --

8    A.   Yes, ma'am.

9    Q.   -- they told you that in August 2020, the grenades in 204

10   were accounted for, logged in, in a forward operating deployed

11   environment, correct?

12   A.   I don't -- they said they were accounted for.  I don't

13   know if they were saying that they were accounted for in a

14   deployed forward operating environment.

15   Q.   And you acknowledge that at that time, he was not on the

16   JSOC compound, correct?

17   A.   That is correct.  Yes, ma'am.

18   Q.   So the unit -- the special operations unit that he was

19   formerly associated with has a record of these same grenades

20   after he is no longer with the unit, correct?

21   A.   Yes, ma'am.

22   Q.   Because he's already in the medical unit recovering and

23   healing correct?

24   A.   He is, ma'am.  Yes, ma'am.

25   Q.   But Mrs. Gibson goes to the compound every day and is



Justin Garcia - Cross

1  affiliated and associated with the same unit, correct?

2  A.   She goes to the J- -- the Joint Special Operations

3  Command Unit.  Our specific unit is on -- on the other side of

4  the wall -- I won't say the other side, but it's not co-

5  located with -- with JSOC.

6  Q.   But she's on the compound?

7  A.   The JSOC compound; that is correct.  Yes, ma'am.

8  Q.   In fact, you have the Government's Exhibit 2, which is

9  Mr. Gibson's enlisted record brief shows, in Section 1,

10  assignment information.  I'll give you a second to flip over

11  there.

12  A.   Um-hum.

13  Q.   His last deployment date, was a four-month deployment in

14  2016, correct?  Do you see that?

15  A.   I do see it here, yes, ma'am.

16  Q.   So --

17  A.   At least that's what it -- that's what it shows here.

18  But to your point, it also doesn't reference that he has his

19  Ranger -- Ranger qualification on the ERB, as it does on the

20  DD214.  So I did identify some discrepancies.

21  Q.   Right.  But they have his official deployment records

22  as -- under Section 1 assignment, start/end date, four months

23  in 2016?

24  A.   Yes, ma'am.

25  Q.   Six months in 2014, correct?



1    A.    Yes, ma'am.

2    Q.    Ten months in 2011?

3    A.    Yes, ma'am.

4    Q.    And he's got some in 2005 and prior, correct?

5    A.    That is correct, ma'am.

6    Q.    And Mrs. Gibson informed CID that she found thousands of

7    rounds of live ammunition in her garage, correct?

8    A.    Yes, ma'am.

9    Q.    And that she found those in early May, right?

10   A.    Yes.  Same time frame -- general time frame as -- as the

11   storage unit, as well as those in the garage.

12   Q.    Can you tell me where on Government's Exhibit 3, the

13   5,000 rounds of live ammunition are accounted for?

14   A.    I believe I said it was in excess of 3,000 rounds.  In

15   Exhibit 3, if you would, they were very variation item

16   numbers.  So item 6 had ammunition -- 6; item 22 --

17        (Pause)

18   A.    -- item 64 had ammunition, item 66, item 67, item 68, 69,

19   item 72.

20   Q.    And I guess, Agent Garcia, what I'm asking is, how did it

21   get from her garage to 204?  Did she put it in there?  Or is

22   that a different set of ammo?

23   A.    No, I --

24   Q.    I apologize.

25   A.    -- I apologize, ma'am.  Maybe I -- I didn't clarify.



1    That ammunition was specifically found in the storage unit.

2    And the subsequent search of the residence is when we found

3    another rather large Pelican case with different

4    ammunitions -- ammunition cans within it, containing

5    additional ammunition, as well.

6    Q.    That she had -- did she tell you she maintained those in

7    her garage from the time of discovery until the time of you

8    searched --

9    A.    That she identified them?  Yes.

10   Q.    Okay.  And you said you did the search at some point

11   later because you had to coordinate with some other agencies;

12   is that right?

13   A.    That is correct.

14   Q.    The search was, in fact, not done of the 68 Frenchie Lane

15   in Bunnlevel until after Mr. Gibson's arrest, right?

16   A.    That is correct.  Yes, ma'am.

17   Q.    It was done late last week, correct?

18   A.    That is correct.  Yes, ma'am.

19   Q.    So he was securely in custody at the time that you did a

20   search of 68 Frenchie Lane with the consent of Mrs. Gibson?

21   A.    That is correct.  As well as -- and with a search warrant

22   as well, yes, ma'am.

23   Q.    And at that point, you recovered this ammunition that she

24   said she had previously found?

25   A.    That is correct.  Yes, ma'am.



Justin Garcia - Cross

1    Q.   And there's not a witness that told you how it got there,

2    correct?

3    A.   Yeah.  Just Ms. Gibson saying that she believed Mr.

4    Gibson is the one that had brought it back in there.

5    Q.   She didn't say she saw him put it there, did you?

6    A.   No, ma'am, she did not.

7    Q.   She said, I just found this in my garage, and I assume he

8    put it here, correct?

9    A.   Yes, ma'am.

10   Q.   There's no video or any other witnesses that are going to

11   say that they saw him possess that ammunition at any time,

12   correct?

13   A.   No, ma'am.

14   Q.   And Mrs. Gibson left 4,500 more -- thousands of rounds of

15   live ammunition in her garage for almost two months, correct?

16   A.   Until -- until it was seized, yes, ma'am.

17   Q.   Without notifying CID for at least forty-five days,

18   correct?

19   A.   No.  There was an initial notification, which I believe

20   we were notified end of -- end of June.  And at that time when

21   she notified us, she had already created a Google drive where

22   she went ahead and uploaded photographs of some of the

23   property that she found to include the ammunition that was

24   found in the garage.

25   Q.   Have you interviewed Dr. Gaskins?



Justin Garcia - Cross

1    A.   I have not, no, ma'am.  I've attempted to make contact

2    with his office, and I'm pending a -- a callback.

3    Q.   So Dr. Gaskins was engaged in an aerial photography

4    business with Mr. Gibson --

5    A.   It is my --

6    Q.   -- correct?

7    A.   -- it is my understanding from Mrs. Gibson that, yes, it

8    is in fact -- that was his business partner to include during

9    the search or the evaluation of the evidence.  We identified

10   some charging -- charging blocks/devices for the -- some of

11   the DJI drones with Mr. Gaskins' name, phone number, and email

12   on it.

13   Q.   So there were some drones or charging blocks related to

14   drones that were not military property?

15   A.   Correct, ma'am.  That -- that is correct.  There are --

16   there were military drone -- or excuse me -- commercially --

17   drones that you can commercially purchase.  But -- but again,

18   these commercially purchased drones are often used by the unit

19   as well.  So it's not uncommon for these commercially

20   purchased drones to be used in some type of capacity by the

21   unit.

22   Q.   But they also could just be commercially purchased drones

23   that were purchased by Mr. Gaskins and Mr. Gibson?

24   A.   Yes, ma'am, that is correct.

25   Q.   And we don't have any information otherwise right now,



Justin Garcia - Cross

1    correct?

2    A.    Correct, not right now.

3    Q.    Okay.  And we don't have any reason to think that Mr.

4    Gaskins or Dr. Gaskins is involved in anything illegal, do we?

5    A.    Not at this time, no, ma'am.

6    Q.    Is your understanding they were, in fact, operating a

7    legitimate civilian business or are in the process of setting

8    the same up, correct?

9    A.    Yes, ma'am.

10   Q.    Did Mrs. Gibson tell you she went to that unit seven

11   times between May and June?

12   A.    No, ma'am, she did not.

13   Q.    Did she offer you any explanation who went out there

14   seven times between her discovery of the items and your

15   search?

16   A.    No, ma'am.  I just know that, again, there was the

17   initial search where she found the things and then again,

18   under the guidance of her therapist to go out there and obtain

19   photographs of some of the items.  How long or how many times

20   she went back out there is unknown at this time.

21   Q.    We'll just have to take her word for it, don't we?

22   A.    At this time, yes, ma'am.

23          MS. SALMON:  Your Honor, I have no further questions.

24          THE COURT:  Any redirect?

25          MR. DEVOE:  Yes, Your Honor.



Justin Garcia - Redirect

 1                    REDIRECT EXAMINATION

 2    BY MR. DEVOE:

 3    Q.   Turning to -- I believe it's Defense Exhibit 1, which was

 4    the USA Storage Center agreement and the access times and

 5    dates at the bottom of what is, on mine, marked as page 3 of

 6    that, there are access grants to Gibson on March 12th, 2021

 7    through June 4th of 2021.  Would Ms. Gibson have been able to

 8    access the unit during those times?

 9    A.   No, sir.

10    Q.   Why not?

11    A.   She was deployed.  And a copy of her -- her 1610, or

12    authorization orders, have been provided and recovered --

13    recovered in this investigation.

14    Q.   So she would have been out of the country?

15    A.   She would have been out of country.

16    Q.   So someone else had access to that unit, clearly?

17    A.   Yes, sir.

18    Q.   And with regard to Mr. Gibson's military unit, would Ms.

19    Gibson have had access to that unit?

20    A.   No, sir.

21    Q.   Would she have had access to the items, the unmanned

22    aerial vehicles --

23    A.   No, sir.

24    Q.   -- used by that unit?

25    A.   No, sir.



1  Q.   But Mr. Gibson was, in fact, a specialist in unmanned

2  aerial vehicles?

3  A.   That is correct.  Yes, sir.

4  Q.   And stuff from Mr. Gibson's civilian partner was found in

5  that unit?

6  A.   Yes, sir, it was.

7         MR. DEVOE:  No further questions, Your Honor.

8         THE COURT:  Thank you, sir.  You may step down.

9         MS. SALMON:  Your Honor, may I briefly recross?

10        THE COURT:  Sure.

11        MS. SALMON:  It's within the scope.

12                    RECROSS-EXAMINATION

13 BY MS. SALMON:

14 Q.   Mrs. Gibson said to you that before she called CID, she

15 went to a former unit member of Mr. Gibson, correct?

16 A.   She did.

17 Q.   Would that person have had access to the unit property?

18 A.   Yes, ma'am.

19 Q.   In like kind to Mr. Gibson?

20 A.   Yes, ma'am.  To my understanding, he was a former unit

21 member.  That individual, I don't know his time line

22 associated with the unit.  But again, I just know he was a

23 former unit member at one point.  I -- I don't know that

24 individual's relationship with Mr. Gibson.  I just know that

25 Mrs. Gibson said that she knew this individual as a former



1    unit member.  He wanted to subsequently make contact with us.

2    Q.   She called that unit member before she called Army CID,

3    correct?

4    A.   She contacted that individual to get in contact with us.

5    Q.   So that person, this former unit member, can you share

6    his name with me?

7    A.   No, ma'am.

8    Q.   So this former unknown unit member from Special Forces

9    made contact with you based on what Mrs. Gibson told him,

10   correct?

11   A.   Yes, ma'am.

12   Q.   Do we know what their relationship is --

13   A.   No, ma'am.

14   Q.   -- Mrs. Gibson and the former unit member?

15   A.   She just said that they were coworkers and that -- that

16   she had worked with him in the past while he was assigned to

17   the unit.

18   Q.   Former coworkers, correct?

19   A.   Currently serving both at JSOC.  I don't know what

20   capacity.  I know, again, Ms. Gibson is within the intel

21   community.  I'm not sure where this individual is assigned to

22   within JSOC.

23   Q.   Are they in a romantic relationship?

24   A.   Not to my knowledge, ma'am.

25   Q.   Did you ask her?



Justin Garcia - Recross

1    A.    Yes, ma'am.

2    Q.    And she said no?

3    A.    Correct.

4    Q.    They're just close friends, right?

5    A.    To my knowledge, yes, ma'am.

6    Q.    We have to take her word for it, correct?

7    A.    Yes, ma'am.

8          MS. SALMON:  No further questions.

9          THE COURT:  Thank you, sir.  You may step down.

10         THE WITNESS:  Thank you, Your Honor.

11         MR. DEVOE:  Nothing further from the government.

12         THE COURT:  Anything from the defense today?

13         MS. SALMON:  Yes, Your Honor.  We have two witnesses.

14   I would first like to call Mr. Gibson's father, Mr. Roger

15   Gibson, to the stand.

16         THE CLERK:  Please raise your right hand and place

17   your left hand on the Bible.

18          DEFENDANT'S WITNESS, ROGER GIBSON, SWORN

19         THE CLERK:  Thank you.

20         MS. SALMON:  And Your Honor, before I begin with Mr.

21   Gibson, I'd like to hand up my Exhibit 1.  I think I never

22   actually introduced it into evidence.

23         THE COURT:  I believe we admitted it, but you can

24   hand it up.

25         MS. SALMON:  Yes, sir.  I have a loose original.  Did



Roger Gibson - Direct

1      I hand it to you, Mr. --

2              MS. SALMON:  Thank you, Your Honor.

3                          DIRECT EXAMINATION

4      BY MS. SALMON:

5      Q.    Good morning, Mr. Gibson.

6      A.    Good morning.

7      Q.    Could you please state your name, address, and explain

8      how you know Parker Gibson?

9      A.    Roger T. Gibson, address 1621 Mission Valley Boulevard in

10     Nokomis, Florida.  And I know Parker because he's my son.

11     Q.    And Mr. Gibson, can you tell us a little bit about Parker

12     and his upbringing?  Just sort of briefly summarize anything

13     you think is important for the Court to know?

14     A.    Well, Parker and -- his mother and I divorced when Parker

15     was probably a year or two years old, and we had joint

16     custody.  At the age of -- I think Parker was probably in the

17     sixth or seventh grade, he asked to come live with me, and we

18     discussed it with his mother.  She granted it and, you know,

19     didn't -- didn't fight it.  So at that age, he came to live

20     with me.

21     And you know, I had had hired nannies and things to watch him

22     as I -- I traveled in my job.  And I hired nannies to help me

23     raise him.  He never gave me any issue.  I can think of one

24     issue where we -- we had a little talk, but I've never known

25     him to be violent, other than with government sanction.  But



Roger Gibson - Direct

1    never have -- I've come home and had to talk to him about

2    being in a scuffle with work -- I mean, at -- at the school or

3    anything like that.  He's never been violent with anyone that

4    I'm aware of.

5    Q.   So when you say government sanction, you mean as part of

6    his duties as the United States --

7    A.   Correct.

8    Q.   -- Army --

9    A.   That's right.

10   Q.   -- service soldier?

11   A.   I mean, that's -- and I'm extremely proud of him and

12   the -- the service that he's given this -- this nation.  I was

13   blown away by his -- his DD214.  I was in the service for

14   three years.  Mine reads like a comic book and his is a novel.

15   I'm just so proud of him.

16   Q.   And what were some of the highlights that you think it's

17   important for the Court to know about Parker's military

18   service?

19   A.   It took its toll on him.  I -- I know -- and I don't --

20   I'm not going to have dates and you know -- and on mine that I

21   can give you, but the very first thing that I remember of

22   noticing a health degradation in Parker was when he was going

23   through some training and he -- he began to have kidney

24   issues.  And I think still today, he -- he sees a doctor for

25   kidney issues.



Roger Gibson - Direct

1   And it just seemed to me that from that point on, we were

2   always talking about how the training was very, very tough and

3   hard on him physically.  I -- I do remember -- I -- I just

4   learned here today, I think, that he actually had been

5   diagnosed with -- I don't remember the initials, but of some

6   kind of head trauma that I -- I wasn't aware of that until

7   today.  But I -- I do know that it -- from what I know of --

8   of Parker, and -- and his training, and his performance in the

9   service, I -- he's a stellar person.  I -- I don't -- there's

10  nothing else to say about the boy.  I don't know.

11  Q.   How has he as a -- have you observed him as a parent to

12  his daughter and stepchildren?

13  A.   I'm sorry?

14  Q.   Have you observed him as a father to his daughter and

15  step- --

16  A.   Oh, yeah.

17  Q.   -- stepchildren?

18  A.   Hayley is his life.  I mean, that's -- that goes without

19  saying.  I -- I know for a fact that -- and I think if we look

20  at the dates, I -- I think her testimony today about how

21  Parker, I think, was being disciplined from his unit.  If we

22  look at the dates of when that occurred, I think we'll see

23  that it coincides when his daughter was involved in an

24  accident.  She was hit by a car on -- on -- on a bicycle.  And

25  the care of her after that was -- was, in my words, dumped on



Roger Gibson - Direct

1   Parker.  There was no help from -- from Kelsey at all to take

2   care of the daughter.  And --

3   Q.   And that was in 2019, Mr. Gibson?

4   A.   Yes.

5   Q.   Was it late in that year?

6        (No audible response)

7   Q.   And Hayley recovered, didn't she?

8   A.   Yes.

9   Q.   Take your time.

10  A.   Thanks.  I think -- I think I'm --

11  Q.   And Mr. Gibson, I'm going to approach you with what I'm

12  going to mark as Defendant's Exhibit 2.

13  A.   I'd like to -- if I can get this out.  I think, again, if

14  we look at the dates, that last deployment of Kelsey to Jordan

15  was during the recovery period of -- of -- of Hayley.  And she

16  had no qualms about going across the world while her daughter

17  was -- was trying to recover from being hit by a car.

18  Q.   And in fact, during that same time period, Mr. Parker

19  Gibson refused or declined a deployment so that he could --

20  A.   That's correct.

21  Q.   -- stay home, correct?

22  A.   Right.

23  Q.   And --

24  A.   Somebody had to stay with her.

25  Q.   And as a special operator, that was not acceptable to the



Roger Gibson - Direct

1    military.  Is that your understanding?

2    A.    Yeah.  My -- my understanding is that at that point,

3    when -- when Parker prioritized his daughter over his unit,

4    that that's when the problems began with Parker and the unit.

5    Q.    And so that would be what agent when Agent Garcia

6    described performance deficiencies.  Is that what you

7    understood the performance deficiencies to be?

8    A.    That's correct.

9    Q.    And his time and his career with the unit did not recover

10   after 2019, correct?

11   A.    That's correct.

12   Q.    And that began Parker's exit from the unit, correct?

13   A.    Right.  Yeah.  He -- he did become disillusioned, and I

14   don't blame him.  You know, he -- he did the right -- in my

15   opinion, he did the right thing.

16   Q.    Parker had made a tremendous sacrifice for the unit up

17   until 2019, correct?

18   A.    Well, he made sacrifices all his life.  He's -- he's been

19   a person of service.  I -- I think still in high school, he

20   was a volunteer fireman.  You know, his whole life has been

21   serving somebody.

22   Q.    Mr. Gibson, I'm going to turn to Mr. Parker and Hayley's

23   recent visit to Florida.  Okay?

24   A.    Okay.

25   Q.    And I'm going to hand you what's been marked as



Roger Gibson - Direct

1    Defendant's Exhibit 2.  Could you identify that for the Court?

2    A.   This is his itinerary that he gave me.  Hayley had

3    qualified for some national competition to be held in Orlando.

4    And he was going to tie a visit together to come see us in --

5    in Nokomis to that competition with Hayley.

6    Q.   And what were the dates of that trip, if you recall?

7    A.   According -- well, of -- of the competition, I'm not

8    sure.  But Parker's dates, he -- he flew down to Tampa on June

9    9th.  He -- he -- they then rented a car and drove directly to

10   Orlando to watch her practice.  And then that evening, after

11   the practice, he drove to our house.  And Hayley was staying

12   with Kelsey; Kelsey was also there.  And they stayed in

13   Orlando, and he came and stayed with us in -- in Nokomis.

14   Q.   And in fact, in the middle of that trip to Florida in

15   June, Parker picked up Hayley --

16   A.   He picked her --

17   Q.   -- from Kelsey, correct?

18   A.   He picked her up on Sunday.  The competition -- he and I

19   drove to the competition.  He came to us on Thursday evening.

20   He and I drove to the competition on Friday to watch it, and

21   Kelsey was there.  The only thing I can say strange -- that

22   was strange to me, she gave me the biggest hug I've ever had

23   from the woman on -- on that day.  And -- which I thought was

24   strange quite -- to be quite honest with you, because she'd

25   never been a big hugger before.



Roger Gibson - Direct

1   But then so that was on Friday.  And then on -- on Saturday,

2   we -- we came back -- Parker and I came back Friday night.

3   Hayley stayed with Kelsey on Saturday.  They had some -- some

4   plans -- activities planned with Hayley -- I mean, with --

5   with Kelsey and Hayley.  And then Parker went back and picked

6   her up on Sunday and -- and drove her back.  And they stayed

7   until, I think, the 16th.  If I remember correctly, they

8   stayed until the 16th.

9   Q.   So they didn't fly home from Florida to North Carolina

10  until July (sic) 16th, correct?

11  A.   That's correct.  That's correct.

12       MS. SALMON:  And Your Honor, I'm going to --

13  Q.   This is a -- Defendant's Exhibit 2.  Is that a copy of

14  the text message that Parker --

15  A.   It -- it is.

16  Q.   -- sent to you?

17  A.   It is, yes.

18  Q.   Does that set forth his itinerary?

19  A.   That's right.

20       MS. SALMON:  Okay.  And can I admit this, Your Honor,

21  as Defense Exhibit 2?

22       THE COURT:  Any objection?

23       MR. DEVOE:  No, Your Honor.

24       THE COURT:  So admitted.

25  BY MS. SALMON:



Roger Gibson - Direct

1  Q.   Now, you said June 16th is when Parker flew home.  Did

2  you get a text message from Parker --

3  A.   I --

4  Q.   -- that helped to establish that day?

5  A.   I did.

6  Q.   And what did he send you?

7  A.   Oh, he sent me a -- a selfie -- maybe one or two selfies

8  of both he and Hayley on the plane.

9  Q.   I'm going to hand you what I'll mark as Defendant's

10  Exhibit 2, after I show it to Mr. DeVoe.

11       MS. SALMON:  Your Honor, I apologize that these are

12  double-sided.  They printed that way, and I apologize.  I'll

13  ask him about side one and side two for purposes of the

14  record.

15  BY MS. SALMON:

16  Q.   Is this a copy of the text message and the photograph

17  that you just testified about?

18  A.   It is.

19  Q.   And what does it show?

20  A.   It shows Parker and Hayley in their airline seats and

21  smiling.

22  Q.   And if you flip it over, what is the date that that text

23  message establishes that Parker texted you to say he and

24  Hayley were back home from Florida?

25  A.   Back home -- I think this date says June 17th, but I



Roger Gibson - Direct

1   believe it was the 16th.  Actually, that's on this side.

2   Sorry.

3   Oh, yeah.  The date on the plane is on this side, June 16th.

4   Q.   So that was the date that they flew home --

5   A.   Yeah.

6   Q.   -- from North Carolina to Florida (sic)?

7   A.   That's correct.

8          MS. SALMON:  I'd like to introduce the text message

9   with the photograph of the airplane flight (indiscernible) one

10  and two.  That's Defendant's Exhibit 3.

11         MR. DEVOE:  No objection.

12         THE COURT:  So admitted.

13         MR. DEVOE:  Thank you, Your Honor.

14  BY MS. SALMON:

15  Q.   So Mr. Gibson, if the storage unit 204 record shows that

16  someone went in 204 on June 15th, 2022, that could not have

17  been Parker, could it?

18  A.   No.  On -- on the 15th, he was at -- at our house.

19  Q.   He was, in fact, at your home --

20  A.   That's correct.

21  Q.   -- on June 15th, correct?

22  A.   That's correct.

23  Q.   With his daughter?

24  A.   Right.

25  Q.   Did Kelsey Gibson express to you, in any way, in the week



Roger Gibson - Direct

1    that you were all of the national gymnastics tournament

2    together, that she was afraid of Mr. Gibson?

3    A.    No, not at all.

4    Q.    She, in fact --

5    A.    She -- she's never expressed that to me ever.

6    Q.    And does she act normally in her interactions with Mr.

7    Gibson coparenting Hayley?

8    A.    Yes.

9    Q.    And did she express any concerns about turning Hayley

10   over to him on June 12th, in another state?

11   A.    No.

12   Q.    She went home without incident, correct?

13   A.    That's right.

14   Q.    Did she go home before he did?

15   A.    That's right.

16   Q.    So she flew home prior to June 15th?

17   A.    Yeah.  My understanding was that she was flying home on

18   Saturday.  After the handoff, she was going straight to the

19   airport.

20   Q.    So on June 12th, she flew home, correct?

21   A.    Right.

22   Q.    And at no time did she raise any concerns or act in a way

23   that showed she was afraid of Parker Gibson?

24   A.    That's correct.

25   Q.    What kind of things has Parker been doing with his time



1    since he's formally retired from the military?

2    A.   Okay.  Well, I've already mentioned how he takes care of

3    Hayley, but one thing that stands out in my mind is that he

4    has been going to counseling and -- I think for his P- --

5    PTSD.  And he had been -- part of that counseling included a

6    horse ranch, where he was taking -- I mean, I don't know how

7    it works.  Supposedly if you take care of horses that

8    soothes -- soothes the body and mind.  And so he was

9    participating in that in -- in a horse ranch.

10   Q.   So any lasting mental health concerns that Parker has

11   had, has he been taking steps to make sure that they're

12   addressed?

13   A.   Yes, ma'am.  And I mean, he does have headaches.  Again,

14   I guess -- now that I've learned of it today, I attribute it

15   to probably the concussions or whatever -- I'm sorry; I forget

16   your name -- but the investigator mentioned.  But yeah, he --

17   he -- he has bad headaches quite a bit.

18   Q.   And does he send you periodic updates of his time with

19   Hayley?

20   A.   Yes.

21   Q.   And pictures of your granddaughter?

22   A.   Yes, ma'am.

23   Q.   And other things that he is doing with his time since --

24   well, now that he's making the transition out of the military?

25   A.   Yeah, his time is filled with Hayley.  I mean, it's --



Roger Gibson - Direct

1    that fills his time.

2    Q.   I'm going to mark these as Defendant's Exhibit 4, Mr.

3    Gibson.  And I think you already have them in your binder.

4    Now, can you tell me who these photographs are of and how you

5    received them?

6    A.   Well, they're Parker and Hayley -- text messages.  I get

7    all my photos through text these days.  And I'm -- this --

8    this -- here's the horse ranch that I was speaking about.  And

9    this -- these are some activities that he does at home.

10   Gardening is once -- one of them.  He's become quite the

11   gardener.  And he -- I think he grows avocados, if -- if I

12   remember correctly.  He took his -- Hayley on a camping trip

13   with Parker and the fish she caught.  She's -- also has an

14   interest in photography because of Parker.  And he -- you

15   know, he -- he's supporting her in that endeavor.

16   This -- this particular picture here was another competition

17   that she was in in gymnastics.  And Parker made a comment in

18   the text that he was particularly proud of the bun in her hair

19   because he had put it there.

20   Q.   So he was learning how to put her hair up for her

21   competitions?

22        MS. SALMON:  Your Honor, I'd like to introduce these

23   photographs as Defendant's Exhibit 4.

24        THE COURT:  Any objection?

25        MR. DEVOE:  No objection, Your Honor.



Roger Gibson - Direct

1          THE COURT:  So admitted.

2   BY MS. SALMON:

3   Q.   And Mr. Gibson, your plan is to return to Florida because

4   you own a business there, correct?

5   A.   Yes, ma'am.

6   Q.   However, if the Court were to release Mr. Parker Gibson

7   on conditions, do you have any concerns that he would have a

8   hard time following court orders?

9   A.   Oh, no, ma'am.  He -- he would do anything.  I -- I asked

10  him.

11  Q.   Is there anything else that you'd like to tell the judge

12  about your son before you're finished with my questions?

13  A.   He's a good man.

14         MS. SALMON:  Thank you, Your Honor.  Nothing further.

15         THE COURT:  Cross-examination?

16         MR. DEVOE:  Just very briefly, Your Honor.

17                      CROSS-EXAMINATION

18  BY MR. DEVOE:

19  Q.   Has your son talked to you at all about the allegations

20  here today?

21  A.   No, sir.

22         MR. DEVOE:  No further questions, Your Honor.

23         THE COURT:  Okay.  Thank you, sir.  You may step

24  down.

25         MS. SALMON:  Thank you, Your Honor.  At this time,



Roger Gibson - Cross

1    we'd like to call our proposed third-party custodian, Mrs.

2    Michelle Melgar.  She is the individual that was interviewed

3    by United States Probation and appears in the pre-trial

4    services report.  And this is our final witness for today.

5            THE CLERK:  Please raise your right hand and place

6    your left hand on the Bible.

7            DEFENDANT'S WITNESS, MICHELLE MELGAR, SWORN

8            THE CLERK:  Thank you.

9                    DIRECT EXAMINATION

10   BY MS. SALMON:

11   Q.   Hello, Mrs. Melgar.

12   A.   Hello.

13   Q.   You were in the courtroom earlier today when the agent

14   was testifying, correct?

15   A.   Correct.

16   Q.   Okay.  So when we're referring to Parker's prior unit,

17   for purposes of today --

18   A.   I am acquainted with it.

19   Q.   Okay.  Will you just refer to it as Mr. Gibson's former

20   unit?

21   A.   Yes.

22   Q.   Thank you.  Mrs. Melgar, please introduce yourself to

23   Judge Numbers, and tell him where you live, and how you know

24   Parker Gibson?

25           THE WITNESS:  Okay.  It's kind of a little story, if



Michelle Melgar - Direct

1    that's --

2         THE COURT:  Oh.

3         THE WITNESS:  I won't take up too much of your time.

4    A.   I'm actually in the process of moving to my new house in

5    Holly Ridge, North Carolina.  My -- I -- so I guess I have --

6    the packers are moving my stuff as we speak.  And my -- where

7    they're packing is 408 South Dougherty Drive, Fort Bragg,

8    North Carolina.  And they're moving me to 506 Birdsong Drive,

9    Holly Ridge, in North Carolina.

10   I came to know Parker after my husband passed away.  He was a

11   member of 3rd Special Forces Group.  Given how my husband died

12   and the deplorable circumstances under -- that led to his

13   death, Parker's unit became overly -- if I could -- if that's

14   even a thing -- overly supportive of my family.  My husband

15   was murdered by two SEAL Team Six members and two Marine

16   Raiders on a deployment in Africa.  I talked to my husband

17   Logan every day while he was deployed.  We texted and

18   everything.  And when the military came to my door and told me

19   that he was sick, I knew it wasn't right because I had

20   FaceTimed him three hours before, the gist of why these guys

21   mean so much to me -- Parker.

22   His unit, believe me, right away when I said the -- these

23   SEALs killed him.  So -- I instantly had some strong trust

24   issues, you know, with the military as a whole.  And then

25   things, throughout the investigation went wrong, both on CID



Michelle Melgar - Direct

1    and NCIS' part that led to even stronger trust issues.  It

2    felt like everybody was doing their best to sweep my husband's

3    death and what happened under the rug.  So after two years of

4    mistakes and negligence and lies and coverups from the four

5    individuals themselves, to people just thinking I was crazy, I

6    began to trust nobody.

7    And I met a few individuals from Parker's unit and they

8    really -- they took me under their wing when I had nobody,

9    like other widows have.  They were there and they believed me.

10   And they made it to where I trusted them and I had a safe

11   place to go.  They've always been supportive, very upstanding.

12   I would say full of integrity men, very prideful in their

13   jobs.  I -- I just can't say enough about Parker and a few of

14   the other guys out there.

15   BY MS. SALMON:

16   Q.   And were the individuals who murdered your husband

17   brought to justice?

18   A.   Yes, they were.  They've all been sent to prison and have

19   about seven felonies.

20   Q.   And did you testify against them in their trials?

21   A.   Many times.  I am comfortable on -- on the stand here.

22   Q.   When did those trials conclude?

23   A.   Last July of 2021.

24   Q.   Was that in Norfolk, Virginia?

25   A.   Yes, ma'am.



Michelle Melgar - Direct

1    Q.    And you are a Gold Star widow, correct?

2    A.    I am, unfortunately.

3    Q.    And Parker Gibson has been a friend and a source of

4    strength and trust to you throughout that process?

5    A.    A very good friend.  Like, being able to confide in

6    people and not have them tell my business or processing a lot

7    of the details I had to endure throughout Logan's -- like

8    finding out what actually went down in his room that night

9    when they busted in and killed him.  Very disturbing details

10   that I couldn't just tell to anybody because it would have

11   ruined their day.  Like I wanted it -- I didn't want them to

12   get off on a technicality.  I wasn't going to blab to the

13   world or go to the media or anything.  So the only people I

14   had to confide in were the people I knew that I could trust.

15   And I wouldn't even see a therapist at that time because I

16   didn't even trust a therapist.  I trusted nobody at all.

17   Q.    And do you understand what it would mean to be a third-

18   party custodian if the judge were to release --

19   A.    Yes, I do.

20   Q.    -- Mr. Gibson?

21   And if he were to release him to stay with you in Holly Ridge,

22   do you have any concerns about your safety?

23   A.    Absolutely not.  And actually, I'd feel more safe.  This

24   is my first time leaving post since my husband's death.  And

25   I'm moving to the area where MARSOC is.  Just -- I want to



Michelle Melgar - Direct

1    live by the beach so they're not going to stop my life.  They

2    took Logan's; they're not taking mine.

3    Q.   What's MARSOC?

4    A.   It's the Marine -- Marine Raider Special Operations.

5    Q.   And do you have any weapons in your home?

6    A.   No, not right now.

7    Q.   Are you going to have any guns in your home?

8    A.   No, not -- not as long as Parker is there.  Like, I -- I

9    follow rules.

10   Q.   Would you have any problem making sure that both your

11   household and Parker complied with any conditions that the

12   Court were to impose?

13   A.   I have no issues with that at all.

14   Q.   Would you make sure he never missed a court date, if it

15   ever became an issue?

16   A.   Absolutely.

17   Q.   And I know that you don't believe he will, but if he were

18   to violate any condition of the Court, would you be willing to

19   turn him in?

20   A.   Definitely.

21   Q.   And you'd do so immediately?

22   A.   Yes.  Absolutely, right away.

23   Q.   Have you ever seen Parker exhibit any kind of concerning

24   volatile or angry behavior?

25   A.   No, never.  I mean, he's, like, the most gentle person I



Michelle Melgar - Direct

1    know.  My -- my husband's dog died this past April.  And it

2    was so hard for me.  Like, we've had her for fifteen years,

3    and I was distraught.  And I went to one of my other friend's

4    house, who is also very good friends with Parker.  And they're

5    from the same unit and it was just like losing the last piece

6    of my -- me and my husband together.  Like, because my two

7    kids are from my previous marriage, but Logan raised them.

8    But you know, this was a puppy Logan had got for me, and she

9    was dying, and it was devastating.  And Parker dropped

10   everything he was doing.  He said, let me come take some last

11   pictures of her for you.  And they're like -- I know it seems

12   dumb; it's, like, a dog, right?  But she's my baby too, and he

13   did that.  He gave me a gift and, like, he just dropped

14   everything.  He had Hayley with them, and they were going to

15   go to gymnastics afterwards.  But he's, like, so considerate

16   of other people always.

17   Q.   Is there anything else you would like the Court to know

18   as he considers whether you'd be an appropriate third person?

19   A.   Oh, I can be trusted.  I don't -- I don't have a record

20   or anything.  Like, I've dealt with the court system a lot.  I

21   have the utmost respect for how the criminal justice system

22   works, given it definitely worked in my case.  And I know

23   there's a process there for a reason.  And I just -- I had --

24   I know I wouldn't have even been asked to do this if Parker

25   didn't -- he never -- if he was planning on doing anything to



Michelle Melgar - Direct

1    not show up or, you know, not comply, I would be the last

2    person he would put through that.  He knows what I've been

3    through over the past five years, the -- the torture, the

4    trauma that I've experienced.  He would not do that to me.

5           MS. SALMON:  I have nothing further, Your Honor.

6           THE COURT:  Cross-examination?

7           MR. DEVOE:  Yes, Your Honor.

8                     CROSS-EXAMINATION

9    BY MR. DEVOE:

10   Q.   Ma'am, who else will live in your home?

11   A.   My two boys.  I have a -- a seventeen-year-old and a

12   nineteen-year-old.

13   Q.   And the home you're moving into, what's the size of that?

14   A.   Four bedrooms, two-and-a-half bathrooms.  It's, like,

15   1,900 square feet.

16   Q.   Okay.  What's your daily schedule?

17   A.   I actually am in -- in the process of writing a book, but

18   right now I'm moving.  So like, my daily schedule, as of this

19   second, is cleaning and packing -- you know, was packing

20   things.  But I'm sure everybody here has moved.  Like, it's

21   chaos, but the military movers are moving everything.  I just

22   have to clean my house, and then show up at the new house, and

23   have my boys help me set stuff up.

24   Q.   And so what do you expect your daily life to be like once

25   you move into the new house?



Michelle Melgar - Cross

1   A.   My -- my job is at home.  I -- I do work at home.  And

2   then I have a son in high school, so he drives himself.  So

3   just, you know, school events, things like -- of that nature,

4   go to the beach every night, you know?  That's why I moved

5   there.

6   Q.   And so you said you have a job that works from home.  Is

7   that separate from the writing?

8   A.   No, that is -- like, that's what I'm doing right now.

9   Q.   That is the writing?

10  A.   Yeah.

11  Q.   Okay.

12  A.   My income -- do you want to know that?  It comes from my

13  husband's death benefits, obviously.

14  Q.   Okay.

15  A.   He provided well for us.

16  Q.   How long have you known Mr. Gibson?

17  A.   Mr. Gibson -- I don't even remember the first date I met

18  him.  But I know we have gotten pretty close since January,

19  February-ish of this year.  Like, we've gotten to be, like, a

20  daily, like, friendship talking.  You know, he's going to do

21  my son's senior pictures.  He's really big in photography,

22  which I love photography.  So it's just something we've kind

23  of discussed a lot about.  But you know, I'm -- an

24  acquaintance, like, here and there.

25  Q.   Okay.



Michelle Melgar - Cross

1    A.    I don't -- I don't even know how long -- after my

2    husband's death.  Like, probably a year -- year, year-and-

3    a- -- year-and-a-half.  I can't remember, sir.  I'm sorry.

4    Q.    So the first time I met him would have been a year, year-

5    and-a-half ago, approximately?  (Indiscernible) --

6    A.    Maybe-ish -- it -- my -- our mutual friend's house.

7    Q.    Okay.  And is the relationship romantic?

8    A.    No.

9    Q.    Just friends?

10   A.    We're friends.

11   Q.    Okay.  But you speak every day?

12   A.    Maybe not every day.  Like, it'll be, like, two or three

13   days where we haven't talked.  And then it's, like, hey, how

14   are you, just doing, like, a buddy check and -- you know, it's

15   stuff like that.  And we'll talk about what we're doing for

16   the day:  Hayley's gymnastics, photography stuff, is Tyler

17   (ph.) back from Texas -- my son, because he went to see his

18   dad, you know, stuff like that.

19   Q.    Has he talked to you all about drones and things like

20   that?

21   A.    I -- I don't know that he has.  My best friend too --

22   that I stay with a lot over there, he told me that Parker did

23   aerial drone stuff, that he was really good at it.

24   Q.    And that's part of the photography business that he does

25   or those are separate things?



Michelle Melgar - Cross

1 A. No, it's -- I don't know that it's a photography

2 business. It's, like, a hobby, like, actual portrait -- like,

3 taking pictures of people, and dogs, and stuff like that.

4 Q. All right.

5 A. It's kind of separate, I would think. I don't know. I

6 can't drive a drone; I tried. So I don't know if they're the

7 same -- my own little drone at my house.

8 Q. Gotcha. Like, the ones you get from Radio Shack kind of

9 thing?

10 A. My dad got for my kids for Christmas.

11 Q. Gotcha. Has he spoken to you about what he did in the

12 military?

13 A. I'm -- not explicitly. I -- I have an idea of what they

14 all do.

15 Q. Okay. Were you aware that he separated from the

16 military -- that you potentially learned today -- but because

17 of the traumatic brain injury and PTSD?

18 A. Yes. And the vast majority of my friends do.

19 Q. Had he had spoken to you about that?

20 A. It's -- it's a common thing.

21 I'm not sure exactly. He mentioned PTSD, or TBIs, or

22 anything, but if I'm being totally honest, I just assume they

23 all have them, given the nature of their job.

24 Q. Do you know Mr. Gibson's wife?

25 A. I do not.



Michelle Melgar - Cross

1    Q.    You've never spoken to her?

2    A.    No, sir.

3    Q.    So Mr. Gibson ever talked to you about the fact that he

4    threatened suicide if his wife ever left him?

5    A.    No.

6    Q.    In the pre-trial services report, when asked about the

7    charges against Mr. Gibson, you said, "This is so bogus.

8    Don't get me started"?

9    A.    Yeah.  Just -- just this -- I've never known Parker to be

10   a violent person or threatening person.  I would never let him

11   stay in my house with my -- myself and my kids if I have ever

12   gotten that inkling of anything.  After what I've been

13   through, I'm not putting my family in a position to endure the

14   same fate as my husband did.

15   I -- I believe, sir, I'm a pretty good judge of character.

16   I -- it has served me well over the past five years

17   specifically.  And I have no concerns about Parker at all.  I

18   feel like I've been around.  I've lived on Fort Bragg for ten

19   years.  I've witnessed a lot of divorces and how ugly things

20   get.  And it's just always so -- more often than not, it

21   ends -- not quite this extreme, but a tit for tat vindictive

22   kind of approach.

23   Q.    Has he spoken to you at all about the charges?

24   A.    No, he has not.  I have not spoke -- spoken anything

25   about it.



Michelle Melgar - Cross

1  Q.   I mean, you talked about trust issues.  What is your

2  opinion of Army CID?

3  A.   I can just vouch for what they did in my husband's case.

4  And they -- you know, their chief that was there for a long

5  time was super sweet to me, like very considerate, and

6  understanding, and helpful to me.  He wasn't the one who did

7  the actual investigation in Bamako, Mali.  He wasn't the one

8  that was there.  So it's not like what went wrong went under

9  his direction or anything.  It's not like I have a bad view of

10  CID or NCIS.  You know, everybody has a job to do.  Mistakes

11  are always made everywhere.

12  Q.   So the trust issues were when you were going through it,

13  you felt like they didn't do a sufficient job with your

14  husband's case or --

15  A.   Just it was different.  It was -- it was a very different

16  case because it -- it is something that they had never dealt

17  with before.  So procedures that -- had the guys been honest,

18  I think different procedures would have been taken.  But to

19  just take the guys who are living in this house with him,

20  they -- they lied to the agents, right?  And so then the agent

21  did things different -- did things a little bit differently

22  than had, like, no pretense been formed at all in his mind

23  already, if that makes sense.

24  Q.   Um-hum.  Given the fact that Mr. Gibson is still married,

25  are you concerned at all about him coming to live with you?



Michelle Melgar - Cross

1    A.    I -- I'm just a friend.  Like, I -- he needs a place to

2    live.  He's been there for me.  You know, like, I talk about

3    how much I miss Logan.  And you know what, I still have bad

4    days every now and again, and he's always there to listen.

5    Very -- I can -- I can tell him things and I know he's not

6    going to blab to the rest of the military about it.  I have no

7    concerns about that because it -- he's my friend.  Like, it's

8    the least I can do to pay him back or -- you know, I would do

9    this for any of the guys.  It's the least I could do.

10   They put up with five years of me crying, and complaining, and

11   you know, going through such a horrible time.  Like, what --

12   how else do you pay those people back?  They didn't have to do

13   that.  That was a choice they made.  And I'm making that

14   choice, too.  And I will continue to do so for the people that

15   have always been there for me and haven't done anything wrong

16   to my family or -- I mean, I don't know what else to say.

17   Like, that's it; I -- I trust him.  And everybody has hard

18   times and it's unfortunate.  And I feel bad.  I feel bad for

19   Hayley.  I feel bad that they're getting a divorce.  Nobody

20   wants that.  Nobody gets married with the intention of getting

21   a divorce.  So this is all unfortunate -- the whole situation

22   is.  I've been through plenty of that.  I know how it feels to

23   feel alone.

24          MR. DEVOE:  No further questions, Your Honor.

25          THE COURT:  Any redirect?



Colloquy

1          MS. SALMON:  No, sir.

2          THE COURT:  All right.  Thank you very much, ma'am.

3     You may step down.

4          MS. SALMON:  Your Honor, before completing the

5     defendant's evidence in this hearing, I do want to -- I've

6     shared this with Mr. DeVoe.  This is a letter from Mr.

7     Gibson's family law attorney that just sort of sets a time

8     frame showing when he was first retained and some of the

9     things that we spoke about with Agent Garcia.  And I would

10    like to introduce that as Defendant's Exhibit 7.  This is a

11    letter from Kevin Foushee, Esquire, with respect to the

12    Harnett County family law matter.

13         THE COURT:  Any objection?

14         MR. DEVOE:  No, Your Honor.

15         THE COURT:  So admitted.

16         MS. SALMON:  Your Honor, I believe that that's

17    Defendant's Exhibit 1 through 5.  (Indiscernible).  Thank you.

18         I have no further witnesses, Your Honor.  But I would

19    like to reserve just a brief time for argument, if Your Honor

20    would accept it.

21         THE COURT:  Sure.  All right.  I'll hear argument

22    from the government.

23         MR. DEVOE:  Thank you, Your Honor.

24         Your Honor, it is undisputed that you have items from

25    a military unit that were not supposed to be there and that



Colloquy

1      were otherwise stolen from that unit without contradiction.

2      Unlike what the defense has otherwise articulated in their

3      questioning to Special Agent Garcia, this is not all based on

4      the statements of the wife.  Your Honor, all the items named

5      in the complaint came from his military unit, not his wife's.

6      The items included items specifically related to his

7      background, including the unmanned aerial vehicles, the dog

8      gear specifically related to his background.  And all were

9      within his reach while he was in the military, not his wife's.

10     His wife explained how and why she rented the unit and why

11     there was a delay in the reporting to law enforcement.

12     Ultimately, you have evidence here that it is clear that she

13     provided that access to somebody else.  And her statement is

14     that it was provided to the defendant in this case because she

15     was out of the country when that unit was accessed.  So

16     clearly, she had provided that access to somebody else and all

17     the items in there were related to him and his background,

18     including the items from his civilian work with the drones and

19     drone photography businesses.

20             We also have evidence, Your Honor, that the grenades

21     themselves were unregistered.  You've heard evidence that the

22     grenades cannot be registered.  In fact, that they are not

23     able to be registered by anyone outside of the military.

24     You've heard evidence as far as there was classified

25     information in that storage unit, that there was the thousands



Colloquy

1    and thousands of dollars' worth of drones.  And ultimately,

2    they all tie back to this particular defendant.

3         Now, in the pre-trial report that we have here today,

4    the probation officer did not have an opportunity to interview

5    Mr. Gibson --

6         THE COURT:  Before we get to the detention side of

7    the argument, there was a discussion -- and I want to be sure

8    I'm clear about it -- with respect to the grenades, and when

9    they were accounted for, and when the defendant had access

10   such that he could get to them.  I believe, from what Ms.

11   Salmon was telling me -- and correct me if I'm wrong -- they

12   were accounted for in August of 2020, but he didn't have

13   access to get them at that point in time.

14        MR. DEVOE:  So Your Honor, according to the military

15   records, the grenades were accessed in August of 2020.  Mr.

16   Gibson was not, at that point, an active member of the unit.

17   We believe that he would have had access, potentially, through

18   others that would have been able to provide him access to

19   those grenades.

20        THE COURT:  Was there any evidence of that?

21        MR. DEVOE:  We do not have any further evidence of

22   that, other than the connection of it to the items in the

23   storage locker, the fact that it was all in a container with

24   other items that were consistent with his military history.

25        THE COURT:  All right.



Colloquy

1    MR. DEVOE:  Your Honor, there is no information in

2    the pre-trial report about his physical or mental conditions,

3    not even -- but you've heard today that he has a significant

4    history of mental conditions.  We do not dispute the fact that

5    he is a decorated soldier who served his country well until he

6    did have the issues he had.  His performance declined.  His

7    relationship with his unit broke down and there were signs of

8    malingering.  His mental condition is uncertain at best,

9    certainly likely reduced.  At his initial appearance, he

10   stated to the Court that he didn't have any mental health

11   conditions, but clearly he does.  And his own defense counsel

12   had asked the agent to provide his medications for that to

13   them.

14         As far as his risk of flight, Your Honor, we would

15   point to his general military training, especially his SERE

16   training, as far as evasion and other tactics, his familiarity

17   with travel and overseas travel, his history as an

18   intelligence officer, again, the apparent falsehood to the

19   Court as far as his mental conditions, and that leads into his

20   safety issue.  If he would flee, recapture would be extremely

21   dangerous.  He claimed to his wife that he would fight his way

22   out if he was backed into a corner.  In fact, the law

23   enforcement had delayed the execution of a search warrant

24   because of concerns about his safety.

25         We also have his background and experience with



Colloquy

1    explosives and his Sapper Tab is what that's called.  His

2    wife, who was --

3        THE COURT:  Your argument is generally because he was

4    special operations and is highly trained, he can't be

5    released?

6        MR. DEVOE:  No, Your Honor.  That gives him the

7    skills in order to be able to do that.  But his wife's own

8    statements discuss about how he has articulated in the past to

9    her that he would carry these things out.  If he were backed

10   into a corner, he would fight his way out; if she left him,

11   that he would commit suicide, and showed her the bullet that

12   he would otherwise do that, and that she has had concerns

13   because of the information that she provided to him, that he

14   would go after her, Your Honor.

15       THE COURT:  Was there any difficulty during his

16   arrest on these charges?  I mean, I know there's a lot of

17   preparation that went into play, but was there actually any

18   difficulty in having him arrested?

19       MR. DEVOE:  One moment, Your Honor.

20       No, Your Honor.

21       We'd also point out that to the extent that the

22   defense is arguing that this is a conspiracy by his wife, that

23   this would have -- the conspiracy that would have had to have

24   gone on here would have been from March of 2021, when she

25   rented this this storage unit, and that it would have started



Colloquy

1    over a year ago, and that she would have been accumulating

2    these items, just preparing to get him into trouble, which we

3    think is not a reasonable activity in this particular case,

4    and that she would have had the wherewithal to include items

5    from his personal job, like the drones with his partner, and

6    concoct the stories and provide all that.

7           The much more reasonable explanation here, Your

8    Honor, is that this defendant was able to get this storage

9    unit, was provided it by his wife, and then put items that he

10   had accumulated, through his military career, into that

11   storage unit.  So thank you, Your Honor.

12          THE COURT:  Thank you.  Ms. Salmon?

13          MS. SALMON:  Your Honor, thank you.

14          This is an unusual case where the defense strongly

15   submits to Your Honor that this criminal complaint should be

16   dismissed for want of probable cause.  There's no evidence

17   when the items went into the storage unit.  There's not a

18   witness.  There's not a picture.  There's not a document.

19   That's it.  There's no evidence of whom, other than the

20   assumption of a person that we've now established cannot be

21   trusted because of her skin in the game.

22          There is no intent.  There's not any evidence of what

23   was going to be done with this grand arsenal in unit 204.  The

24   evidence one might expect when you're going to charge a Purple

25   Heart recipient, who sacrificed twenty years of his life to



Colloquy

1    the U.S. Army and to service of this country with a felony,

2    one would expect that we would have some evidence of him

3    making overtures to sell this kind of stuff or to do something

4    with this kind of stuff.  This sheer finding of these items in

5    unit 204 is not probable cause that Parker Gibson committed

6    either of the crimes charged in the criminal complaint.

7          I want to turn to the criminal complaint, because

8    it's extremely important to note what Judge Gates (ph.) did

9    not know when he signed the arrest warrant.  A reasonable

10   person would not find probable cause on these facts, Your

11   Honor.  There is no actual possession in this case.  Okay?  So

12   that's always our first step when we consider it.  Is it an

13   actual possession case or will the jury be instructed on

14   constructive possession?

15          Is there evidence that Parker Gibson ever held these

16   things?  No.  Will there ever be video?  No.  Is there a

17   witness saying that he took them off the JSOC compound, the

18   Joint Special Operations Command compound, Your Honor, the

19   basement?  There are so many names for this thing.  It is

20   supposedly one of the most secure compounds in the world.  Yet

21   the government's theory rests upon the idea that Parker

22   Gibson, who has been in medical unit and outside of his

23   special operations division outside the compound since 2019,

24   according to the government theory, somehow made it off of

25   JSOC with two ten-foot wingspan armed payload carrying drones.



Colloquy

1    And his last forward operational deployment was 2016, Your

2    Honor.  So just so we're all clear about what the actual

3    implication here is.  They lost these things for five years or

4    seven years, and no one knew.  It just defies common sense.

5    And this probable cause standard is still a common sense

6    standard.  Did Parker Gibson have ownership, dominion, control

7    over the contraband or the premises in which the contraband

8    was found?

9         And Your Honor, I submit to you there is absolutely

10   insufficient evidence that he did, because the key statement

11   in the criminal complaint is that Parker Gibson has exclusive

12   control over 204.  I want to turn to our Exhibit 1.  Parker

13   Gibson is not even listed as a person with authorized access

14   on storage unit 204.  Kelsey Gibson is the person who has

15   authorized access on 204.  If there's a problem, the email

16   address klsygibson@gmail.com is what would be called.  It is

17   her phone number provided.  You'll see others with authorized

18   access is scratched out, so she doesn't even provide him as

19   listed as a person who has authorized access.

20        Now let's go to later in that Defendant's Exhibit 1.

21   The actual evidence in this case, Your Honor, does not support

22   a finding of probable cause because this record itself shows

23   that Ms. Gibson or someone else accesses this unit seven times

24   between May 1st and June 22nd, 2022.  Now, why is this

25   important?  This is important because Roger Gibson



Colloquy

1    established -- you'll see June 15th, 2022, 8:45 a.m., unit

2    204, Parker Gibson is in Florida at his home.  So we know that

3    this is not Parker Gibson with exclusive control to unit 204.

4         No one had this record, Your Honor.  We subpoenaed

5    this record.  This was not something that Army CID had.  But

6    it, in fact, shows multiple entries.  We cannot simply make

7    the assumption that Parker Gibson must have put it there

8    because we don't have any idea when those items were placed in

9    unit 204.  They could have been placed May 4th.  They could

10   have been placed May 24th.  Golly, they could have been placed

11   June 15th, 2022, while Parker Gibson was in Florida.  The idea

12   that they were placed there immediately when he rented the

13   storage unit is just a completely unsubstantiated inference.

14   There's no evidence to support that.  There's no evidence to

15   support that he has ownership, dominion, or control over 204.

16        Your Honor, Mrs. Gibson is not here, and we're not

17   making a credibility determination about her today.  But I

18   think it is remarkably interesting -- and this is such an

19   important fact that I don't want the Court to miss -- the

20   agent's testimony as she cuts the lock when she goes out there

21   on the 1st of May.  Okay?  She goes in; she goes, knock,

22   knock, hey, USA Storage; I'm Kelsey Gibson; this is my name; I

23   need some bolt cutters because I can't get in my storage unit.

24   Sure, says the twenty-two-year-old guy who works there.  She

25   takes her bolt cutters out and she cuts it.



Colloquy

1    When Agent Garcia gets back out there on June 22nd,

2    it's locked.  It's locked; she's put a lock back on it.  What

3    does that tell us?  It's not Parker Gibson, because when he

4    gets out to his storage unit on May 7th, he's going to be

5    pretty upset if he's storing Fort Knox in 204, and all of a

6    sudden, now his keys don't work.  I mean, this is just common

7    sense.  If she locks it back up with a new lock after cutting

8    the bolt on May 2nd, as Agent Garcia has testified, it cannot

9    be him.

10    THE COURT:  I'm kind of glad she put a lock on it

11    after breaking the old one off, right?

12    MS. SALMON:  Absolutely.

13    THE COURT:  Because there's a lot of stuff in there

14    that is very valuable.  But what's your argument?  I'm not

15    quite clear what your argument is here.  Like, obviously, she

16    put a lock on it and then it had to be unlocked when they went

17    out in June to look at everything.  So what's the argument

18    here?

19    MS. SALMON:  The argument is she accessed it seven

20    times --

21    THE COURT:  Okay.

22    MS. SALMON:  -- in between that and the search, Your

23    Honor.  Seven times, where we have absolutely no idea what's

24    going in and out of there.  Absolutely none, and there won't

25    be any.  Think about it this way.  What if it's not the wife,



Colloquy

1    who we have reason completely to distrust because they have a

2    very contentious custody dispute going on.  What if it's a

3    confidential source?  What if it's a confidential source?  And

4    the information does not say it's someone we've deemed to be

5    credible because we've worked with them before.  Probable

6    cause falls.  There's no reason to take her word for it

7    without some substantiated piece of evidence.

8         THE COURT:  I mean, what do we do with the fact that

9    this stuff, from the testimony we've heard is tied to your

10   client's former unit, and particularly the swag, right, I

11   think is tied to the unit and can only be obtained through the

12   first sergeant, who he worked for.  I mean, that seems to

13   provide some link.  I understand you have a lot of good

14   arguments to make here.  But I think, doesn't that tie --

15   can't it potentially tie him to these items in there?

16        MS. SALMON:  Well, Your Honor, I would say that,

17   number one, I don't believe he's charged -- I don't believe

18   the charging document is for the possession of those things,

19   right?  So the question of whether or not you should keep the

20   T-shirt from your deployment and maybe that ends up in your

21   storage unit, versus I have a drone that carries a payload,

22   like we are a football -- those are as far as the central

23   question, right?

24        Your Honor, I don't think that the fact that there

25   are some items in 204 that may be Mr. Gibson's is at all



Colloquy

1  relevant to the finding of probable cause and actual criminal

2  charges, right?  I mean, this is, after all, his wife.  So

3  there's a surfboard in there.  There's some camping equipment

4  in there.  I don't think that the idea that there are some

5  items that are tied to the unit is in any way dispositive

6  about who is in control over it.

7       And in fact, Your Honor, some really strange fact

8  here that it's over forty-five days between her discovery of

9  the items and her turning it in, correct?  That's the

10  testimony.  It's at least forty-five days between the 1st of

11  May and the end of June.  And she doesn't notify CID.  The

12  agent acknowledges that she has a duty to do so.  Your Honor,

13  the evidence we heard today is that the only person that we

14  know was in constructive possession of these items is Kelsey

15  Gibson.  From the time she put that lock on it, after cutting

16  it, to when she actually bothered to get CID out there in June

17  of 2022.  When she puts that lock on, she's in ownership,

18  dominion, and control.  The testimony is she contacts a unit

19  member.  That's the first person she tells.  And that unit

20  member, who is also going to have access to every single unit

21  item that he had access to, is who goes to CID.  So this

22  person is even in the story already.

23       And we cannot miss the importance of the fact that

24  Parker Gibson is not going to have access to those grenades in

25  August 2020.  He's not on the JSOC compound.  He's at the



Colloquy

1   headquarters unit in Healing Transitions. We're not here for

2   a trial today, Your Honor, but I think it's helpful to say

3   would a search warrant have issued for this unit on the facts

4   that we know, or should it have. And I would submit to Your

5   Honor it would not, because you would have to go back and say,

6   give me some piece of evidence about who put it in there, now

7   that we know that she is also able to access that unit and did

8   so seven times between discovery and search.

9          So Your Honor, for those reasons, we do not think

10   that a reasonable person taking the totality of the

11   circumstances and using just basic common sense would say

12   there is probable cause that Parker Gibson constructively

13   possessed these items at any time. And in fact, the only

14   evidence of constructive possession that has been shown by

15   probable cause here today is that Kelsey Gibson did, between

16   May 1st and June 22nd, 2022.

17          Now, I want to turn to the detention issues, if Your

18   Honor would like me to.

19          THE COURT: Well, so --

20          MS. SALMON: Yes, sir?

21          THE COURT: I'm looking at the elements of theft of

22   government property, which is what he's charged with in the

23   first count, right? And that's the thing of value belonged to

24   the United States and had a value in excess of 1,000 dollars.

25   The defendant embezzled, stole, purloined, or converted



Colloquy

1    something of value for his own use, and that he did so knowing

2    the property was not his, with the intent to deprive the

3    government of the use of the property.  And you're saying that

4    there's not probable cause of that here?

5         MS. SALMON:  Correct, Your Honor, because there's no

6    probable cause to show that he ever possessed it or stole it,

7    right?  I mean, possession of stolen property -- let's sort of

8    think about that as the other charge.  We still have the

9    constructive possession problem, right, because there's no

10   evidence of actual possession.  I think that Agent Garcia

11   conceded that because they were talking about constructive

12   possession.  Where is the evidence to satisfy the element that

13   he stole it, that he took it off the compound?  There's no

14   evidence of that; there's none.  Simply that this was found in

15   a storage unit in his wife's name on June 22nd.  So same

16   issue, right, because you still have to have the actual

17   intentional element for the theft, and the stealing, and the

18   conveyance, not just sort of like possession of stolen goods

19   when kids get charged in state court because they've got,

20   like, this great big TV in their car and it turns out it was

21   stolen.  That's different; that's different.

22        I want to turn to detention because there's a bridge

23   here that has to be made.  Obviously, I want to talk about the

24   strength of the government's case, which I know is the least

25   important.  But this time it actually is a factor that I



Colloquy

1    believe is in the defense's favor, so I'm going to begin with

2    it.  The strength of the government's case, Your Honor, is

3    remarkably weak.  It remains our position that this should be

4    dismissed for want of probable cause.  This is an extremely --

5    I'm going to set this forth as a path because this is where

6    this case is going.  For there to be probable cause, Parker

7    Gibson has to have exclusive custody and control.  Agent

8    Gibson -- I'm sorry -- Agent Garcia testified she

9    (indiscernible) in there, no keys, not a place she was

10   supposed to go.  Your Honor, she cannot consent to a search of

11   a place unless she has some dominion, control, or possession

12   of it.  This is the hotel exception.  This is --

13           THE COURT:  Well, I mean, I don't want to get too far

14   ahead of where we are.  I understand your argument, but I

15   mean, this is -- isn't this really the home with two owners,

16   and the one who's there consents to the search, and the second

17   person who isn't there wouldn't consent to the search?  I

18   mean, isn't that really what we have here?

19           MS. SALMON:  No, Your Honor, there's actually a

20   really robust amount of case law about this kind of stuff,

21   about storage units.  There are Third Circuit cases; there are

22   Seventh Circuit cases.  There's a Fourth Circuit case that's a

23   little bit different because a lot of times, apparently, drug

24   dealers store their stuff in storage units --

25           THE COURT:  I've heard.



Colloquy

1    MS. SALMON:  -- and their cash, and other things.  So

2    then they inevitably get in conspiratorial fusses, and one

3    wants to confess -- I'm sorry -- consent.  But it actually

4    somewhat goes to the issue.  Actually, that's not true.  It

5    completely, in my reading of the case law, goes to the

6    question of who had access and who had control.

7        So what it usually comes down from the Fourth Circuit

8    because I can see you thinking ahead of me.  I'm not too

9    presumptuous, is would the agent have believed she was giving

10   valid consent.  But if she is as adamant, as we heard Agent

11   Garcia say today, don't have the keys, I'm not supposed to go

12   there, I don't want him to know I'm there, Your Honor, this is

13   the case that is extremely strong for the evidence to be

14   suppressed.  But you see, they need to have it both ways.  He

15   needs to have exclusive control for purposes of establishing

16   the elements, but she needs to have dominion and control for

17   purposes of giving Fourth Amendment consent.  They're not

18   going to get to have it both ways.  The facts have to be one

19   way or another.  And I submit to Your Honor, she's actually

20   the individual with dominion and control, as she demonstrated

21   from May 1st to June 22nd.

22       Now, straightforward, what is the detention related

23   issue here?  Your Honor, Parker Gibson, his whole adult life,

24   has demonstrated the highest integrity and ability to perform

25   as a Special Forces soldier.  He has been trusted with



Colloquy

 1    America's most important defense issues and missions, here and

 2    abroad.  He has been so trusted by the United States that we

 3    can't even say the name of his unit on the record.  He was

 4    trusted with that.  He performed; he was awarded at the

 5    highest levels.  Your Honor, Parker Gibson is an American

 6    hero.  He is a military hero.  At forty-two years old, he has

 7    both a Purple Heart and two Bronze Stars, not to mention all

 8    of these Army commendations.  He has no criminal record.  He

 9    doesn't have a single arrest related to anything.  He is the

10    best candidate for release that I can imagine proffering to

11    the Court, based on what is in the pre-trial services report

12    and what you heard today.

13         There is intimation from the government that his wife

14    somehow wants him still in custody and that he's some kind of

15    a threat to her.  Your Honor, you've heard from Roger Gibson

16    that that is a completely unreliable and self-serving attempt

17    by Mrs. Gibson as part of her family law efforts in this case.

18    Because time line again, May 1st, she goes out to unit 204 and

19    is stunned because there's all this stuff.  She continues,

20    until he is arrested on July 22nd, 2022, to have Parker Gibson

21    caring for their daughter together, who is nine, and their

22    son, who is fifteen, every day while they are out of school

23    and he is at work.  So this idea that he is somehow now,

24    because of these charges, so dangerous that he cannot be

25    trusted to come to court or he will hurt someone should be



Colloquy

1    completely disregarded.  She for three months, if we follow

2    her story, knowing what's in that storage shed, said goodbye

3    every day, went to work and left him with two children to take

4    care of.

5            What did we actually show about his character?  Since

6    his official separation from the army, from Special Forces, he

7    has done remarkably thoughtful things to make sure that he is

8    addressing the lingering health issues that we so often see

9    with these soldiers, and especially the ones where we ask as

10   much of them as we ask from Parker Gibson.  He does horse

11   therapy, Your Honor.  He goes out, and rides horses, gets in

12   nature, works with animals to make sure that he is in touch

13   with things that are meditative and mindful.  He is complying

14   with all kinds of medications that help him with things like

15   migraines, low testosterone, other issues, kidney functioning,

16   all that he gave in his sacrifice to this country.

17           He is in photography.  He takes pictures of people's

18   aging pets.  He grows avocado trees in his backyard.  He flew,

19   in June, to Florida to go to a gymnastics tournament for his

20   daughter.  And again, this idea of dangerousness, which only

21   comes from his wife, who's got an axe to grind, from the

22   defense perspective.  Nevertheless, on June 12th -- you heard

23   Mr. Gibson -- she turns the daughter over to Mr. Gibson in

24   Florida -- just bye -- and goes back to North Carolina so that

25   he can stay with Parker and the grandparents for an additional



Colloquy

1    week.

2         Your Honor, any suggestion that Parker Gibson is a

3    danger to anyone should be disregarded out of hand.  There's

4    no evidence that he's a flight risk.  He has shown over a

5    lifetime of integrity, and commitment, and courage that he can

6    not only follow military orders, but certainly court orders.

7    Mrs. Melgar was clearly a suitable third-party custodian.  We

8    ask that if Your Honor does not dismiss this criminal

9    complaint, that you find he's suitable for release and release

10   him on whatever conditions Your Honor chooses to be

11   appropriate.

12        One more thing with respect to probable cause, Your

13   Honor.  If the government wants to go out and find actual

14   evidence that he ever possessed this, they can do so.  And

15   once they have that actual evidence, instead of just taking

16   Mrs. Gibson's word for it, they can indict him.  We're aware

17   of that.  They should have to, because this evidence is

18   insufficient to establish probable cause that this man

19   possessed those items at any time.

20        Thank you, sir.  I thank you because I know this was

21   a long hearing.  And I thank you for all of your patience.

22        THE COURT:  Thank you.  Mr. DeVoe, I'll give you the

23   last word if you like it.

24        MR. DEVOE:  Yes, Your Honor.  I'm honestly a bit

25   confused as to the defense's probable cause argument.  There



Colloquy

 1    is, in fact, evidence here that it is the -- I mean, so there

 2    is the wife's own statement, as far as providing access to

 3    the -- or providing access to the storage unit to the

 4    defendant in this case.  Whether they agree that the wife's

 5    word is something that is can be supported or not is a

 6    separate question.  But we do have the wife's word, and that

 7    her word is, in fact, supported by the evidence that was found

 8    in the unit itself, as you had raised with defense counsel.

 9    So we believe that there is sufficient evidence for probable

10    cause in this case.

11        With regard to detention, Your Honor, we believe that

12    the defendant -- we do not dispute the fact that the defendant

13    has served honorably in the military and did years' worth of

14    quality work for the military.  That then deteriorated at the

15    end, based on mental health and other conditions.  And the

16    wife's statement is that she is afraid of what he will do now

17    that he knows that she is the one who provided this evidence.

18    She also provided the statements that he has said.  Having

19    been his wife for a number of years, that she would be in the

20    best position to say this, but that he has said if he was

21    backed into a corner, he would fight his way out, and if she

22    ever left him, he would shoot her, and he showed her the

23    bullet that he would do that with.  And so for those reasons,

24    Your Honor, we believe that detention is appropriate in this

25    case.  Thank you.



Colloquy

1      THE COURT:  Thank you.  All right.  Let me take some

2  time to consider this matter.  Obviously, there's a lot we've

3  gone over today.  We'll be in recess till 2 o'clock.

4  Defendant's to remain in the custody of the marshals.

5      THE CLERK:  All rise.  This court will be in recess

6  until 2 o'clock.

7      (Recess from 12:52 p.m., until 2:05 p.m.)

8      THE COURT:  So I've considered the credible evidence

9  and the credible information presented here today.  I make the

10  following findings.  We're going to find there's not probable

11  cause for this action going forward.  I certainly understand

12  why my colleague issued the arrest warrant that he did, based

13  on the information in the criminal complaint.  However, the

14  evidence presented here today presents substantial questions

15  on the defendant's access to the allegedly stolen items and

16  substantial questions about who put those items in the storage

17  unit and when they arrived there.  The record reflects

18  substantial access to that unit throughout the relevant time

19  period.  And there's an indication that another individual had

20  substantial access to that unit in the weeks leading up to it.

21      I believe all of that precludes me from finding

22  probable cause to support the allegations against the

23  defendant.  So I'm going to dismiss the criminal complaint and

24  discharge the defendant.

25      This decision, however, does not prejudice the



Colloquy

1    government's ability to pursue a second complaint against the

2    defendant or to pursue an indictment in front of the grand

3    jury.  And should the grand jury find it appropriate to issue

4    an indictment, that would certainly be the grand jury's

5    prerogative.  As a result, I deny the motion for detention is

6    moot.

7            Anything further from the United States?

8            MR. DEVOE:  No, Your Honor.

9            THE COURT:  Anything further from defense?

10           MS. SALMON:  No, Your Honor.  Thank you.

11           THE COURT:  All right.  The defendant is remanded to

12   the custody of the U.S. marshal for final processing and

13   release.

14           We're in recess.

15           THE CLERK:  All rise.  This court is now in recess.

16                       (Court is adjourned)

17                       *  *  *  *  *

18

19

20

21

22

23

24

25



1                    CERTIFICATE OF TRANSCRIBER

2

3          I, Sara Bernstein, court-approved transcriber, in and

4   for the United States District Court for the Eastern District

5   of North Carolina, do hereby certify that pursuant to Section

6   753, Title 28, United States Code, that the foregoing is a

7   true and correct transcript from the official electronic sound

8   recording of the proceedings held in the above-entitled matter

9   and that the transcript page format is in conformance with the

10  regulations of the Judicial Conference of the United States.

11

12                  Dated this 21st day of August, 2022.

13

14

15         /s/

16         _____

17         SARA BERNSTEIN, CDLT-127

18         COURT-APPROVED TRANSCRIBER

19

20

21

22

23

24

25



(973) 406-2250 | operations@escribers.net | www.escribers.net